STATE OF MISSOURI at the Relation of SCHLUETER MANUFACTURING COMPANY, a Corporation, Relator, v. CLYDE C. BECK, Judge of the Circuit Court of the City of St. Louis.—85 S. W. (2d) 1026.

Court en Banc, September 4, 1935.

*Allen, Moser & Marsalek* for relator.

*Gerritzen & Gerritzen* for respondent.

ELLISON, J.—Original proceeding in prohibition. .Charles E. Slater, as plaintiff, sued the relator herein, the Schlueter Manufacturing Company, as defendant, in the Circuit Court of St. Louis for damages, alleging that through the negligence of the latter he had contracted an occupational disease while employed as a paint sprayer in its paint shop in St. Louis. By means of a spray gun he sprayed bronze, aluminum, lac-enamel, lacquer enamel, and zinc paints. In his petition he charged that as a result of inhaling the fumes or spray from these painting materials, or in some way by coming in contact with them (the petition in the damage suit is not in this record) he developed the disease aforesaid.

While the case was pending in Division One of the Circuit Court of St. Louis before the respondent, the Honorale CLYDE C. BECK, judge thereof, the plaintiff filed an application for an order to photograph and inspect the premises of the relator and to take samples of the foregoing painting materials for chemical analysis. The circuit court entered an order granting this application in part. The relator thereupon filed his petition in prohibition in this court praying that Judge BECK be prohibited and restrained from executing and enforcing, or in any wise carrying into effect, said order. This court issued its provisional rule in prohibition and the respondent

judge filed a demurrer and motion to quash. The issues here thus become questions of law.

The application of the plaintiff Slater below for the order to inspect and take samples was as follows:

"Comes now plaintiff and prays that the Court order defendant to permit plaintiff to inspect the factory, premises, spray booths, machinery and plant of the defendant at 4616 N. Broadway, in the City of St. Louis, Missouri, and for the purpose of so doing, to permit a chemist to obtain samples of bronze, aluminum, lac-enamel, lacquer enamel, red stripping paint, zinc and their respective thinners, and a photographer to accompany plaintiff or his attorney on said inspection, and as grounds for this motion plaintiff states that his injuries, for which this suit is brought, were sustained while plaintiff was employed by defendant as a paint sprayer, spraying the above-mentioned paints, aluminums, lac-enamels, etc., by means of an air-pressure spray gun, in that by reason of the nature of the work and surroundings there, plaintiff was caused to be injured; and sustaining an occupational disease; that plaintiff desires to inspect the said premises for the purpose of ascertaining the condition there; and to obtain samples of bronze, aluminum, lac-enamel, red stripping paint, lacquer and enamel and zinc, and their respective thinners; that without such inspection and samples plaintiff cannot safely proceed to trial; that the said inspection is necessary and indispensable for the further prosecution of the said lawsuit, and the plaintiff's attorneys are not acquainted with the technical nature of the said work, nor with the appliances, paints, bronze, aluminum, lac-enamels, lacquer enamels, red stripping paint, zinc and their respective thinners, and their chemical constituents and solvents or paraphernalia located on said premises and are unable to proceed to trial without such knowledge.

"Wherefore, plaintiff prays that the Court order defendant to permit plaintiff within a specified time to make an inspection as aforesaid, sufficiently before trial of the said case, to enable plaintiff to properly prepare the same."

The order made by the respondent judge, assailed in this proceeding, is as follows:

"The Court having heard and duly considered the plaintiff's application and supplemental application for leave to inspect the premises of the defendant corporation and to obtain samples and specimens of paints, etc., heretofore filed and submitted herein, and being sufficiently advised of and concerning the premises doth order that said application be granted in part as prayed, and the Court doth order that the plaintiff and his attorney, together with one chemist and one photographer, be and they are hereby authorized to enter the premises of the defendant corporation at 4616 North Broadway, in the City of St. Louis, State of Missouri, to inspect the premises,

spray booths and machinery of said defendant corporation, only at said places where plaintiff was working during his employment by the defendant, to-wit: the paint shop on the 4th floor of the defendant's said plant.

"It is further ordered by the Court that plaintiff and said chemist be permitted to make an inspection of samples not to exceed three ounces each in quantity of the following, to-wit: bronze, aluminum, lac-enamel, lacquer enamel, red stripping paint, zinc and their respective thinners, in order to enable said chemist to determine the chemical constituents thereof; said analysis of said samples to be made on the premises of the defendant corporation, or if said analysis be made elsewhere, then the same shall be made only with the consent of the defendant corporation, and a representative of the defendant shall be permitted to be present at such time.

"It is further ordered by the Court that the plaintiff and the photographer be permitted to take photographs of the premises of the defendant corporation only at said places where plaintiff was working during his employment by the defendant, to-wit: the paint shop in the 4th floor of the defendant's said plant.

"And it is further ordered by the Court that the defendant permit plaintiff, his attorney, chemist and photographer to enter the premises of the defendant corporation to make said inspection and examination, and that the defendant be permitted to have its representative present at all times during said inspection.

"And it is further ordered by the Court that said inspection be made on the 7th day of February, 1935, at 11 o'clock A. M."

The relator maintains that the foregoing order is and was beyond the lawful jurisdiction of the respondent judge:

(1) because the circuit courts of this State have no statutory, common-law or inherent power to make orders of that character;

(2) because the order violates Sections 11 and 30, Article II, Constitution of Missouri, and the Fourteenth Amendment of the Constitution of the United States in that it attempts to authorize an unreasonable search of the relator's premises which would disclose its entire process of manufacture in its paint shop; and also attempts to allow a seizure and destruction of its property by permitting the plaintiff to take three-ounce samples of each of its enumerated painting materials;

(3) because the plaintiff's petition in the damage suit below discloses that a period of approximately four years had intervened between the termination of his employment and the institution of his damage suit; and the application for the court order did not allege that the conditions prevailing and the processes and materials used in the relator's paint shop when the plaintiff worked there were the same as now; in consequence of which evidence as to these present facts would be immaterial;

(4) because the application shows no necessity for the disclosures sought, and the order based thereon is a mere license for a "fishing expedition."

I. The respondent concedes there is no statute authorizing the order but points to the fact that similar orders have been upheld in this and other states without statutory sanction. In State ex rel. American Mfg. Co. v. Anderson, 270 Mo. 533, 194 S. W. 268, L. R. A. 1917E, 833, decided in 1917, this court en banc held the circuit court had inherent power to make an order requiring the defendant to permit the plaintiff and his counsel to visit its manufacturing plant with experts and photographers, and to make measurements, drawings and photographs before the trial for use as evidence in the case.

This Anderson case states that under the common law of England the courts of that country had practically unlimited power of search and seizure and exercised it so oppressively that when this nation was founded the Fourth Amendment of the Constitution was adopted to protect the people against unreasonable searches and seizures; and that for like reason a similar provision was included in the constitutions of many of the states, in Missouri this being Section 13, Article 13 of the Constitution of 1820, now Section 11, Article 2, Constitution of 1875. On this historical basis, mainly, the opinion rests its conclusion that the circuit courts of this State have inherent power to make *reasonable* orders requiring a litigant to submit his premises to the inspection of his adversary, where necessary to do justice between the parties in a master and servant personal injury case. The relator takes issue with this decision, contending that the power to grant to a litigant the right of such inspection never resided in the English common-law courts until 1854 when it was conferred by Stat. 17 & 18, Vict., chap, 125, sec. 58.

We think the relator is right, so far as the historical question is concerned. The common law of England adopted in this State in 1816 was the common law as it stood prior to 1607, the fourth year of the reign of James the First. [1 Territorial Laws, p. 436; sec. 2, Schedule, Constitution of 1820; Sec. 645, R. S. 1929; 12 C. J., sec. 21, p. 192.] And it seems to be settled that at that time, and for nearly 250 years afterward until the aforesaid English statute was enacted, the common-law courts of that country had not assumed the power to grant orders for the inspection of chattels and premises, though such relief by bill of discovery in chancery in aid of a law case was allowed as early as 1686. [Marsden v. Panshall, Vern. 407, 23 Eng. Reprint, 548.] The doctrine that courts of law inherently possess such power is declared by text writers and annotators to be a modern doctrine. [3 Wigmore on Evid. (2 Ed.), sec. 1862, p.

996; 3 Jones on Evid. (2 Ed.), secs. 2040, 2045, pp. 3784, 3796; L. R. A. 1917E, 838, note; 33 A. L. R. 16, note.] The power of search and seizure early exercised by the English courts, and referred to in the Anderson case, supra, is a wholly different thing. It was not a remedy which could be invoked by an ordinary litigant against another for the discovery of evidence in a civil action, but was resorted to by the crown in the administration of the criminal law, the enforcement of claims of the government and the like. [56 C. J., secs. 1, 4, pp. 1154, 1155; 24 R. C. L., sec. 2, p. 701; 1 Cooley's Constitutional Limitations (8 Ed.), p. 612; Cornelius on Search and Seizure (2 Ed.), sec. 3, p. 12.]

But granting the power of a law court to allow an inspection of the chattels or lands of an adversary litigant is a modern conception, we are convinced it is necessary to the administration of justice under modern social and economic conditions; and that the Anderson case did not go too far in saying our circuit courts have discretionary authority to exercise it—notwithstanding we have no statute so providing, and notwithstanding the English law courts did not enforce such discoveries under the common law. We are not tied inextricably to the English common law which our ancestors adopted. In Duke v. Harper, 66 Mo. 51, 60, it was held that although this State adopted the common law of England by a statute which contained no qualification that it be applicable to our condition, still our courts are at liberty to declare that any portion of it inapplicable to our condition and circumstances does not obtain here. And earlier, in Reaume v. Chambers, 22 Mo. 36, 54, in discussing the question whether actual seizin of the wife's land is necessary to entitle the husband to curtesy, this court, in an able opinion by Scott, J., said, "whatever may be the common law on the subject, the circumstances of the country demand a modification of the rule."

Neither do we understand that in exciding parts of the common law we must do so as of the date of its adoption in this State, and say so much of it never did prevail here; nor are we always limited to a mere negative right of rejection, without the power to allow an appropriate remedy in the circumstances. From time to time, with the coming of definite, general (as distinguished from local) changes in our social order we can accommodate *our* common law to them, certainly, at least, in matters affecting the proper functioning of our courts in the administration of justice. As the Supreme Court of Illinois said in Kreitz v. Behrensmeyer, 149 Ill. 496, 502, 36 N. E. 983, 984, 24 L. R. A. 59, 62, "The common law is a system of elementary rules and of general judicial declarations of principles, which are continually expanding with the progress of society, adapting themselves to the gradual changes of trade, commerce, arts, inventions and the exigencies and usages of the country." [See, also, 5 R. C. L., secs. 1, 2, p. 806; 12 C. J., secs. 5, 17, pp. 178, 188.]

And it is obvious that these social and economic mutations need not be purely evolutionary changes in customs, usages and industrial practices; they may spring from legislation which has given direction to our social development though in the beginning such enactments were not designed to supplant the common law outside the range of their specific application.

It is unnecessary to refer to the startling changes that have come with the years through the increase in the population and wealth of this country, through advancements in science and through the larger operations of aggregated capital, as a result of which the proof and defense of cases have become more difficult. But a word as to the changed general attitude of our law toward civil litigants in the matter of discovery of evidence may not be amiss.

Under the common law no litigant could be compelled to testify at the demand of his adversary. [4 Wigmore on Evid. (2 Ed.), sec. 2218, p. 716; Benoist v. Darby, 12 Mo. 196, 206.] Neither could he, under the common law prior to 1607, be required to disclose his case in advance of the trial except to a very limited extent in allowing the inspection of certain classes of records and documents—though this rule was greatly relaxed in the middle of the eighteenth century with the accession of Lord MANSFIELD as Lord Chief Juctice of England and then restricted under his successor, Lord KENYON, 3 Wigmore on Evidence (2 Ed.), section 1858, page 970 (which shows the law courts of England were conceded the *power* to make such changes). So, also, in certain instances corporal examination was enforced as by the writ *de ventre inspiciendo*, in mayhem appeals, and divorce actions where impotency was alleged, 4 id., section 2220, page 723, though it is said by some authorities these cases were special and exceptional, and establish no common-law principle. [14 R. C. L., sec. 15, p. 700.] But it is clear that a litigant was not bound to allow in advance an inspection of his chattels and premises. [3 Wigmore on Evidence (2 Ed.), sec. 1862, p. 996.] However, courts of chancery, recognizing the hardship of this doctrine, soon began to allow relief against it through the cumbersome method of granting bills of discovery in aid of actions at law. [3 Wigmore on Evidence, secs. 1857, 1862, pp. 968, 996.] The original inherent power of equity to grant a discovery is unquestioned. [9 R. C. L., sec. 2, p. 164.] And there are several early English cases beginning in 1686 in which courts of chancery allowed inspection of chattels and premises evidentially involved in actions at law. [(1686) Marsden v. Panshall, 1 Vern. 407, 23 Eng. Reprint, 548; (1799) Lonsdale v. Curwen, 3 Bligh, 168, 4 Eng. Reprint, 166; (1804) Walker v. Fletcher, 3 Bligh, 172, 4 Eng. Reprint, 568; (1816) Brown v. Moore, 3 Bligh, 178, 4 Eng. Reprint, 571; (1820) Kynaston v. East India Co., 3 Swanst. 248, 36 Eng. Reprint, 850, on appeal, 3 Bligh, 153, 4 Eng. Reprint, 561.]

In this State, discoveries of evidence have never been restricted to courts of chancery. Since the first revision of our statutes in 1825 courts of law have been authorized to require a party litigant to produce at the trial of a cause books or writings in his possession or power containing evidence pertinent to the issue. [R. S. 1825, p. 631, sec. 37; Secs. 924, 925, 927, R. S. 1929.] And in 1855 a statute was passed giving our courts a discretionary right to order either party to a pending civil action to give to the other *before the trial* an inspection or copy, or permission to take a copy, of a paper in his possession or under his control, containing evidence relating to the merits of the action or defense. [R. S. 1855, p. 1266, sec. 40.] This section is now Section 928, Revised Statutes 1929, and covers also the photographing of papers.

But more to the point, and likewise from the beginning of our State government, our statutes have conferred upon courts of law authority to grant a discovery of evidence by taking testimony before the trial. From 1825 to 1855 it was provided that either party to a suit at law should be entitled to a discovery from the other of matters material to the issue whenever he would be entitled to the same discovery by aid of a court of chancery. The discovery was to be obtained through interrogatories. [R. S. 1825, p. 631, sec. 38; R. S. 1835, p. 462, sec. 10 et seq.; R. S. 1845, p. 818, sec. 12 et seq.] In the next statutory revision rather elaborate provisions were substituted, providing for the examination of the adverse party before the trial by interrogatories in relation to any fact or facts material to the issue, and requiring him to submit for inspection, in connection with his answers to the interrogatories, any necessary documents, books, vouchers or other writings. [R. S. 1855, pp. 1290-3, secs. 28-44.] Speaking of these provisions, this court said in Bond v. Worley, 26 Mo. 253, 255: "No bill of discovery is now allowed since our statute has provided other more convenient modes by which every purpose of such bills can be attained." Evidently, in so holding the court did not have in mind the fact that for many years in England one of the purposes of bills of discovery had been to allow a direct inspection of chattels and premises. But this much can be said of the case: it shows this court considered our statutes had not destroyed the right of litigants to the disclosure of any fact which could have been obtained by a bill of discovery in chancery.

The foregoing sections were dropped from the next statutory revision, Revised Statutes 1865, page 686, and no provisions of like nature have ever appeared in them since—for this reason. Up to 1855 the common-law rule prevailed in Missouri that neither litigant could be compelled by his adversary to testify, Benoist v. Darby, 12 Mo. l. c. 206, save in trials before justices of the peace, Revised Statutes 1845, page 654, section 24; Revised Statutes 1835, page 361, sections

16, 17. In the Revision of 1855 the common-law rule was abolished and it was provided that any party to a civil action might compel the adverse party to testify as a witness either at the trial or by deposition, under penalty of punishment as for contempt and of having his petition, answer, reply or motion stricken out upon his refusal to do so. [R. S. 1855, p. 1577, secs. 3, 4.] These sections, with some changes not affecting their bearing on this point are now Sections 1725, 1730, Revised Statutes 1929. Also, throughout these years we have had a statute providing that "any party to a suit pending in any court in this State may obtain the deposition of any witness, to be used in such suit conditionally." [R. S. 1855, p. 653, sec. 1; Sec. 1753, R. S. 1929.] The result is that for the last eighty years it has been possible for a litigant to obtain the testimony of his adversary in advance on any fact material to the issues.

Our decisions hold this method of obtaining a discovery by deposition has taken the place of bills of discovery. [Tyson v. Farm & Home Savings & Loan Assn., 156 Mo. 588, 594, 57 S. W. 740, 741; Vogelsong v. Wood Fibre Plaster Co., 147 Mo. App. 578, 587, 126 S. W. 804, 807.] And not only that: it is said these statutes evidence a legislative policy, or theory, that "truth has nothing to fear from light." [Ex parte Welborn, 237 Mo. 297, 304, 141 S. W. 31, 34.] The common-law theory was that a lawsuit was like a game and that litigants had a right to conceal their evidential resources. [3 Wigmore on Evidence (2 Ed.), sec. 1845, p. 924.] Under the law now either party can compel the other to testify by deposition concerning his chattels and premises. What logical reason is there (save one we shall mention in the next paragraph) why the party seeking the discovery should not be permitted to inspect a physical object which he can compel his adversary to describe? "When the reason for a rule of law fails, the rule fails." [State ex inf. Norman v. Ellis, 325 Mo. 154, 164, 28 S. W. (2d) 363, 367.] Since 1885 it has been the established law in Missouri that the circuit court has a discretionary right to order a physical examination before the trial of a plaintiff suing for damages for personal injuries. [Shepard v. Mo. Pac. Ry. Co., 85 Mo. 629, 633, 55 Am. Rep. 390.] If a court can order an inspection of the *person* of a litigant, certainly it can allow an inspection of his property. We have no hesitation in holding that our circuit courts have discretionary jurisdiction to order such inspection. This ruling, if not warranted on the theory that it is a new application of the old common-law rules permitting an inspection of certain books and records and enforcing submission to corporal examination in certain cases, can be justified on the ground that any common law to the contrary is in conflict with the legislative policy of this State and inapplicable to our conditions.

Some cases hold that a court order for the inspection of premises cannot be made because it attempts to authorize a trespass and violates

the rights of the possessor. [Martin v. Elliott, 106 Mich. 130, 133, 63 N. W. 998, 999, 31 L. R. A. 169, 170; U. P. Ry. Co. v. Botsford, 141 U. S. 250, 254, 35 L. Ed. 734, 738, 11 Sup. Ct. 1000, 1002.] According to the minority view the same is true of orders compelling a litigant to submit to a physical examination. But the weight of authority seems to be the other way on both these propositions; it is definitely so on the latter one. [See L. R. A. 1917E, 838, note; 33 A. L. R. 16, note; 51 A. L. R. 184, note; 14 R. C. L., sec. 14, p. 696.] So far as concerns the general jurisdiction of the court to make such orders, we think the majority view is correct; if it were not so they could not be made in any case. Speaking broadly, everyone owes a duty to the State in the judicial administration of justice to disclose whatever will serve the ascertainment of the truth. This applies not only to his testimony but to demonstrative evidence—his body, his papers, his chattels and his premises. [4 Wigmore on Evi. (2 Ed.), sec. 2194, p. 653, sec. 2216, p. 710, sec. 2221, p. 740.] He can be required to leave his home or business and attend court as a witness. By a *subpoena duces tecum* he can be compelled to bring his chattels into court as evidence. An officer may go upon his premises (without force) to serve civil process and it will not be a trespass. [50 C. J., sec. 85, p. 486.] We are unable to agree that orders for the inspection of chattels and premises in civil litigation, *as a class*, are beyond the power of a court because they violate the rights of the individual.

But neither do we agree with the view which we understand to be expressed in 3 Wigmore on Evidence (2 Ed.), section 1859-d, page 990, note 2, that the Constitution has no application to civil discoveries, and that an individual is not protected against an unwarranted court order for the inspection or seizure of his property or premises by the constitutional prohibition against unreasonable searches and seizures, and the due process clause, Sections 11 and 30, Article II, Constitution of Missouri. It has been held, and we think rightly, that a court order requiring a litigant to submit for the inspection of his adversary papers not material to the controversy, or all his papers, is unconstitutional. [Carden v. Ensminger, 329 Ill. 612, 622, 161 N. E. 137, 141, 58 A. L. R. 1256, 1263; Ex parte Brown, 72 Mo. 83, 93; State ex rel. A. T. & S. F. Ry. Co. v. Trimble, 254 Mo. 542, 558, 163 S. W. 860, 864.] So, also, where a court ordered certain premises and the steam engine, boilers and appurtenances thereon into the custody of the police department for use as exhibits in a criminal case (the owner of the premises was not the defendant) it was held the seizure was unconstitutional. [Newberry v. Carpenter, 107 Mich. 567, 65 N. W. 530, 31 L. R. A. 163.] We can see no reason why the protection of the Constitution against unreasonable searches and seizures should not extend to an unreasonable order in a civil case as much as in a criminal case, though

it is true the constitutional provision was adopted to prevent oppressive exactions in the latter class of cases.

II. The court order in this case authorized the plaintiff to take for chemical analysis three-ounce samples of certain enumerated painting materials mentioned in the order. The relator strenuously complains of this part of the order, asserting it plainly attempts to authorize an unconstitutional seizure of his property. However, there are cases in which such orders have been upheld. In Beyer v. Transit Development Co., 124 N. Y. Supp. 463, 139 App. Div. 724, where a plaintiff sued for damages for personal injuries resulting from a steam boiler explosion he was denied a court order authorizing him to go upon the premises for the purpose of taking a sample of the water used by the defendant in its boiler. He appealed and the New York Supreme Court held the order ought to have been made. It should be stated, though, that no constitutional question was raised or discussed in this case.

In Russell v. Cowley, Webster's Patent cases, 457, 459, decided in England in 1833, the petitioner, being desirous of bringing an action at law for the infringement of a patent, prayed a discovery in chancery. An order was made authorizing the plaintiff and his solicitor and two other persons to go upon the premises of the defendants to inspect their factory and its machinery while in operation. The order further provided that ''the said viewers respectively should be at liberty to carry away with them any specimen of the pipes or tubes operated upon by them, or in their presence, as they might think proper, in order to their production in court on the trial of the said action.''

In Patent Type-Founding Co. v. Walter, 70 Eng. Reprint, 613, decided in 1860, the English Vice Chancellor's Court in a suit to enjoin a patent infringement held that the court had jurisdiction on motion to order a defendant to deliver a sample of printer's type to the plaintiffs for analysis, and an order was made accordingly requiring the delivery of not exceeding four ounces of the type. The value thereof was stated to be not more than a few pence.

In Bennett v. Griffiths, 30 L. J. Q. B. 98, 121 Eng. Reprint, 517, 521, decided in 1861, after the enactment of the Common Law Procedure Act of 1854, 17 & 18 Vict., chap. 125, sec. 58, authorizing a court to make an order for the inspection by either party of any real or personal property, the inspection of which may be material to the proper determination of the question in dispute, it was held that as ancillary to such inspection the court had jurisdiction to authorize a plaintiff inspecting a defendant's mine to make a driftway or opening in a wall so that the mine could be ventilated and freed from obnoxious or explosive vapors. This case is cited and discussed in Montana County v. St. L. Mining & Milling Co., 152 U. S. 160, 38

L. Ed. 398, 14 Sup. Ct. 506, where a Montana statute permitted inspection of mines by adversary claimants was held to be not unconstitutional.

These English cases were not, it is true, decided with reference to constitutional provisions such as ours. But they were decided with a view to the rights of the parties. In our opinion the constitutionality of an order authorizing the taking of a sample of something to be found on inspected premises, would depend on the facts. The taking of a vial of water, or a trowel of earth, or a tuft of grass, or something of inconsequential value which could be removed from the premises without damage, surely could not be called an unreasonable seizure. On the other hand the taking and destruction of something of substantial value without compensation or security therefor it seems would be an unreasonable seizure, also violating the due process clause. Such a taking would be comparable to a court order attempting to compel the plaintiff to submit to a physical examination which would endanger his health.

In this case there was nothing in the plaintiff's application for the inspection order showing the value of the samples of paint proposed to be taken. Nowhere in the record does the value appear. The presumption is in favor of the right action of the trial court. The burden is on the relator to show that the respondent lacked jurisdiction or exceeded his jurisdiction. In the absence of a sufficient showing on this point in the relator's petition for our writ and in view of the respondent's demurrer thereto, we must hold with the respondent that the order was not unconstitutional as authorizing an unreasonable seizure of its property.

III. The relator further contends the respondent's order was unreasonable and therefore unconstitutional because it would compel the relator to disclose its entire process of manufacture in its paint shop. The law recognizes that a litigant is entitled to some degree of protection against the disclosure of trade secrets. [4 Wigmore on Evid. (2 Ed.), sec. 2212, p. 701.] And it doubtless is true in some cases that a court order for the inspection of chattels and premises of a litigant violating his rights in that regard would amount to an excess or abuse of jurisdiction. But in this case the relator does not allege that it has any trade secrets, or that secret processes are used in its paint shop. We are therefore unable to hold that the respondent's order was invalid on that ground.

IV. The next point made by relator is that the plaintiff's application for the inspection order did not state the conditions prevailing and the processes and materials used in its paint shop at the time the application was filed were the same as when the plaintiff worked there and allegedly contracted an occupational disease four years

earlier. It is therefore contended that facts ascertained by an inspection of the premises at this time would be immaterial and of no probative value in proving what the conditions were four years ago. On this point Cuca v. Lackawanna Steel Co., 122 N. Y. Supp. 732, 138 App. Div. 421, is cited.

Referring back to the plaintiff's application for the order, set out early in this opinion, it will be seen the application does not allege that conditions in the paint shop now are the same as they were four years ago. We do not, however, agree with the relator that the application fails to charge the same painting materials are in use now as were used four years ago. The application begins with a prayer that the court order the defendant (relator) to permit the plaintiff to inspect its factory and to permit a chemist to obtain samples of certain enumerated painting materials. Then the application proceeds by saying "and as grounds for this motion plaintiff states that his injuries, for which this suit is brought, were sustained while plaintiff was employed by defendant as a paint sprayer, spraying the *above mentioned paints,*" etc. (Italics ours.) It seems to us this sufficiently alleges that the paints which the plaintiffs used while working in the factory are those, or like those, from which he seeks to take samples now.

It is, undoubtedly, the rule that an application for such inspection orders must show the materiality of the evidence sought to be discovered, either in equity or under the statutes, in such states as have statutes covering the matter. [18 C. J., sec. 20, p. 1067, sec. 64, p. 1093.] On the question as to whether the plaintiff's application in this case sufficiently alleges that conditions in the relator's paint shop are the same now as they were four years ago, we are in doubt. In Beyer v. Transit Development Co., 124 N. Y. Supp. l. c. 465, the plaintiff prayed for an order allowing it to go upon the defendant's premises and take a sample of water. The defendant contended that the evidence obtained from an analysis of the water would not be competent or material because such analysis at that subsequent time (1910) would not show the character and quality of the water in use in 1908. On this point the New York Supreme Court said: "But there is no evidence that there has been any change, and the court certainly cannot take judicial notice that such is the case. It may be that upon the trial such a state of facts will be presented as to make the evidence here sought incompetent; but for anything that now appears it is competent, and may be material to the decision of the action." However, we cannot say that there is any presumption or probability in this case that the conditions in the relator's paint shop now are the same as four years ago. We are not satisfied with the plaintiff's application for the order in this respect. In this connection see Cuca v. Lackawanna Steel Co., 122 N. Y. Supp. 732. But we pass from that question to the one next discussed.

V. The law is well settled that a discovery will not be granted where the facts are within the petitioner's knowledge, 18 Corpus Juris, section 19, page 1067; or where he has failed to show diligence in seeking to secure the information, 18 Corpus Juris, section 23, page 1069; or for his mere convenience. [18 C. J., sec. 57, p. 1088.] Neither party ought to be required simply to facilitate his adversary's preparation of the case against him. The plaintiff had worked in the relator's paint shop for a long enough time to contract the occupational disease which is the basis for his damage. He must have known the kinds of paint he worked with. He could not help but know the conditions in the shop. He does not allege in his application that he had no knowledge of these conditions and the painting materials. The application merely alleges that "the plaintiff's *attorneys* are not acquainted with the technical nature of the said work, nor with the (here follows an enumeration of the painting materials) located on said premises, and are unable to proceed to trial without such knowledge." (Italics ours.) In respondent's brief here (not the plaintiff's application below) it is stated "They (the paints) are, however, the same brand of paints and contain the same constituency as the brand of material handled by plaintiff four years ago." So the case amounts to this. The plaintiff knows the brands of paint in use when he was employed in the shop, and he knows they contain the same ingredients as the paints now used. He merely wants to obtain samples of these paints from the relator's paint shop for analysis instead of getting them somewhere else. By taking the deposition of relator's employees and officers (if necessary) he could identify the materials used. From other sources he could prove whether the ingredients therein are poisonous. Court orders for the invasion of the premises of a litigant and the taking of samples of his property ought to be made with caution and reserve in any case. Under the facts we think respondent exceeded his jurisdiction in this case. And our provisional rule in prohibition is therefore made absolute. All concur, except *Collet, J.,* not sitting.