POTASHNICK TRUCK SERVICE, INC., Appellant, v. CITY OF SIKESTON et al.—No. 37960.—173 S. W. (2d) 96.

Division Two, July 20, 1943.

*Bailey & Bailey* for appellant.

*Robert A. Dempster* for respondents.

ELLISON, J.—This is an appeal from a decree of the circuit court of Scott County declaring appellant's stock pen a nuisance, and denying an injunction against the respondent city to restrain the enforcement of its ordinance so declaring and ordering removal of the pen within thirty days. The appellant's petition in the circuit court challenged the constitutionality of the ordinance. That contention has been abandoned on this appeal and the basis for appellate jurisdiction in this court is that the [97] value of appellant's outlay is $8,000 and the expense involved in complying with the ordinance would equal or exceed $25,000.

There is practically no dispute on the applicable law, and the case must hinge on the conclusions to be drawn from the evidence. Appellant concedes that municipalities of this state have a right to declare what constitutes a nuisance and to abate nuisances even in a summary manner. Yet it further and correctly asserts this power cannot be exercised unreasonably, abusively or capriciously; and that such action is subject to review by the courts, both as to the fact of the nuisance and as to the manner of abatement. The further assignment is made, and was pleaded in appellant's petition, that the respondent city is estopped by its own laches. The facts are as follows.

Appellant is duly engaged in the business of transporting freight and live stock as a common carrier. A large portion of its northbound freight from Sikeston to St. Louis and East St. Louis is live stock, mainly cattle and hogs. It operates a stock pen on a part of Block 2, Chamber of Commerce Addition to the City of Sikeston, near the intersection of U. S. Highways 60 and 61. It has been maintained at that location for four or five years, and was put there with the oral consent of the city authorities. Prior to that time appellant had a pen in its wagon yard at another location nearer the center of town and was required to remove it to its present location because complaints arose on account of the stock feeding carried on at the former location.

The pen is about 20x30 or 35 feet in size. It has a sheet iron roof, is divided into sections inside for the separation of cattle, hogs and sheep, and the floor is graveled with white rock chat. It has a capacity of 150 hogs and would accommodate a varying number of cattle according to their size. It chief use is in assembling live stock brought

from the neighboring farming district by local trucks and transferring it to through trucks bound for the city live stock markets. The stock is not fed or watered in the pen, but there is a hydrant by means of which hogs, especially, are sprinkled in hot weather.

Appellant's main office or dead freight terminal is within 60 feet of the stock pen. One of appellant's officers testified it is necessary for the two to be close together so that the employees of the main office can wait on trucks coming to and departing from the stock pen. He insisted it would not be feasible to have the pen alone removed to the edge of or outside of town because the stock trucking business at the pen is too intermittent to warrant the stationing of an employee there; and besides he might make private trades and cheat the company. On the other hand if the company should move its main office and terminal to the edge of town along with the pen the business would lose contact with the public. One of the appellants testified they have a payroll of $25,000 or $30,000 a month and that the livelihood of three or four hundred people depends on their business— all this indicating the live stock traffic through the stock pen is considerable.

When the appellant's freight terminal and stock pen were built at their present location it was a small cotton patch. There were a number of houses in the vicinity, and at least one restaurant. Appellant's general manager, Eugene Potashnick admitted "we built the pen knowing people lived in the neighborhood. It was a residential section." Since then the appellant's business has grown greatly and many other businesses have been established there. We take judicial notice that Sikeston is a growing city, having a Federal census population of 5676 in 1930 and 7944 in 1940.

Appellant's officer testified: "The pen is surrounded practically in all directions by businesses," established restaurants, filling stations, barber shops, garages, hotel, shoe factories, etc. Directly west across Highway 61 is a park owned by the International Shoe Company, and immediately north thereof is that Company's factory. North of Highway 60 are a number of filling stations and bulk plants. Directly north of the stock pen is a filling station. Beyond that, in the order named, are a restaurant, a garage, a business building (drug store?) and a hotel. South of the stock pen, across the street, is a barber shop. Eastwardly, in order, are a cleaning shop, a vacant lot, then residences continuing on Greer Avenue. East of the terminal are a vacant lot, a garage, a hotel and a former auction barn and livestock pen now used by the W. P. A. for distribution of their produce. The Lewis cleaning and pressing shop is within 40 feet of the stock pen, his residence 10 feet further.

Regarding the condition in which the stock pen is kept, and its effect on health, peace and comfort. Appellant's witness [98] Dr. Old, a deputy State Veterinarian, and he had examined the stock pen

the morning of the trial and thought it all right. There was no odor and it did not look like it had been cleaned that morning. General Manager Potashnick testified "wherever there is livestock there is odor;" but that they did no feeding or watering there and the pens were kept clean. As an illustration he stated that his livestock trucks, after being washed out, hauled government inspected fresh meat back from St. Louis on the return trip. He also said there are other stock pens in the city, but their location, condition and extent of use were not shown. There was no *general* ordinance in Sikeston regulating the keeping of such places. Two other witnesses testified for appellant on the question under discussion. One was Joe Ryan who ran a filling station and cafe across the street from the stock pen. He said he had not noticed or been bothered by any offensive odor or by flies. Ike Parker had a barber shop about 100 feet from the stock pen. He hadn't paid any attention to the flies. On cross-examination he admitted appearing before the city council on a former occasion and stating the boys who worked at the stock pen used bad language. He hadn't heard any since.

Dr. Kindig, city physician and health officer of the respondent city said he had examined the stock pen several times. Sometimes he found it in pretty good condition and as clean as a stock pen could be. Other times it was pretty foul. He declared stock pens even in clean condition certainly are not conducive to public health because they draw flies. In his opinion it is impossible to make a hog pen so clean it would not be detrimental to health; and he though this particular pen, "where it is located, definitely is a menace to the health of the inhabitants." Six residenters of the stock pen neighborhood testified for the respondent City. Mr. and Mrs. Lyman Gross ran the Gross Hotel about 150 feet from the stock pen; Elzie Humes lived 100 feet away; Mrs. Ray Wagner about 100 feet; and Mrs. Harry Lewis, wife of a cleaning and pressing plant operator, about 50 feet. All of them testified the pen gave off disagreeable (some said unbearable) odors and drew swarms of flies especially in the summer; and that the live stock loaded, unloaded and confined there made noises, pigs squealing and calves bawling day and night. The stock would be there mostly from midafternoon indefinitely into the night (appellant said usually not longer than from 2:30 to 9 P. M.) particularly on Saturdays and Sundays. Humes averred the smell in the hot summer would drive him off his front porch.

On the issue of estoppel and laches, the testimony for appellant was that when it moved from its former location to the present one, because of complaints about stock feeding, the city authorities selected the new site after first proposing "If we will stake out a pen and build you a sewer will you move out there?" Appellant accepted the proposal and the City built the sewer. Then a year or two before the trial a complaint was made about the stock pen and the City

decided it was unfounded. That was in February, 1938. Subsequently the appellant made improvements and spent money in so doing. The City inspected the premises about May 6, 1940. Appellant obtained a permit to put a sheet iron roof on the pen, and did so, though it was not in the fire zone to which such permits were regularly restricted. The record is not clear as to when the roof was built. On several occasions policemen and a committee of the City Council approved the premises, including the roof. And they said ''everything was fine, clean, sanitary and in good shape.'' The date of these inspections is not clear.

It appears, however, that there had been trouble between the City and the appellant recently before May 6, 1940, for the record shows the City adopted on that date the very ordinance No. 1492, involved in this suit. And the ordinance recites that on April 1, 1940, a notice was served on appellant ordering it to appear before the City Council to show cause why the alleged stock pen nuisance should not be abated and removed as required by law. It further recites that the parties (complainants and defendants) appeared and after hearing the evidence the Council found the stock pen did in fact constitute a nuisance dangerous and detrimental to public health. The City records show a notice and summons to appellant and its officers were issued on April 8, 1940, requiring them to appear before the Council on May 6, 1940, the date of the ordinance, at 7:30 P. M., and that the notice was duly served.

■ Having in mind the rule that in equity cases an appellate court will usually defer to the findings of the chancellor on conflicting oral evidence, Gorman v. Mercantile-Commerce Bank & Trust Co., 345 [99] Mo. 1059, 1064(2), 137 S. W. (2d) 571, 574 (4, 5), we cannot see our way clear to overturn the findings of the learned trial judge here. For it certainly cannot be said the weight of the evidence is overwhelmingly against them. On the contrary we think the weight of evidence supports them. Appellant admits it is maintaining the stock pen in the midst of a populous business, manufacturing and residential section at the crossing of two important U. S. Highways in a growing city, and that its own business has expanded substantially.

While, as we stated in the beginning, there is not much dispute about the law of the case it is better to refer to several authorities cited by appellant. We need not consider the question whether the keeping of one or more hogs or cows within the corporate limits of a small city, town or village sometimes is not a nuisance per se which the municipality can prohibit altogether by general regulatory ordinance, as was held in Kays v. City of Versailles, 224 Mo. App. 178, 181, 22 S. W. (2d) 182, 183. That question is not involved here.

Appellant points to another case, City of Sturgeon v. Wabash Ry. Co., 223 Mo. App. 633, 637, 17 S. W. (2d) 616, 618(2), which says:

"Even where the general power exists to declare a nuisance, a city cannot declare the place of a single individual to be a nuisance in the absence of a general regulation applicable to all others of the same class," citing 19 R. C. L., sec. 117, p. 813 (text at note 2) which in turn cites Parker v. Fairmont, 72 W. Va. 688, 79 S. E. 660, 47 L. R. A. (N. S.) 1138. In this Parker case the city council after a hearing had declared the plaintiff's dye works a nuisance because it emitted smoke and soot, and he was granted a permanent injunction. Apparently there were other smoke emitting establishments in the city. The city charter authorized the council "to prevent injury or annoyance to the public or individuals from anything dangerous, offensive, or unwholesome; . . . to abate anything which, in the opinion of a majority of the council, shall be a nuisance." The general city ordinances specified certain things which might be declared nuisances and abated, but did not include smoke emitting establishments among them.

The decision held the plaintiff's business was not a nuisance per se, and that the city had no right to strike at him alone without having made a just and reasonable *regulation* as to the production and emission of smoke and soot, applicable to all alike of the same class. It further held the general provision quoted above from the city charter did not contemplate anything except that which would be a nuisance under the common law, or by statute or ordinance; and that the city could not declare something a nuisance which is ordinarily lawful. The opinion strongly relied on Yates v. Milwaukee, 77 U. S. 497, 19 L. Ed. 984, where the city was legislatively authorized to establish dock and wharf lines on a navigable river *by ordinance* but had failed to do so (or at least had failed to plead and prove that fact); and yet by ordinance it singled out plaintiff's wharf as an encroachment on navigation and declared it a nuisance, when there was no evidence that it was an actual obstruction to navigation or in any sense a nuisance.

We think these decisions are not in point here. In both of them the thing condemned was something not regarded as a nuisance in the absence of a municipal or statutory regulation so declaring.[1] In this case Sikeston is a city of the third class, and under Sec. 6957, R. S. 1939, Mo. R. S. A., sec. 6957, is empowered by ordinance to regulate, suppress or abate stockyards, pigpens, cow stables and other stables; to regulate or prevent the carrying on of any business which may be dangerous or detrimental to the public health; and to prevent, abate and remove nuisances in a summary manner at the cost of the occupant. And there can be no doubt that the continuous maintenance and congestive use of a hog and cattle pen in such an environment as

[1]See in this connection St. Louis v. Heitzeberg Packing Co., 141 Mo. 375, 42 S. W. 954, 64 Am. St. Rep. 516, 39 L. R. A. 551, and by the same author; State v. Power, 185 Mo. 79, 92, 84 S. W. 10, 12, 68 L. R. A. 402.

that shown here, with resulting sounds, smells, filth and vermin detrimental to the peace, comfort and health of numerous surrounding inhabitants would be a public nuisance,[2] **[100]** or even a nuisance per se in the sense that any similar place would always be a nuisance in like circumstances.[3] The respondent City's evidence showed those conditions existed.

Still dwelling on the question whether the City of Sikeston should have first passed a *general* ordinance regulating the keeping of stock pens. As bearing thereon, 2 Dillon on Municipal Corporations (5 Ed.), sec. 690, p. 1045, divides nuisances into three classes. The first is nuisances per se denounced by the common law or statute. The municipality itself, has direct power summarily to abate them. The second class consists of nuisances where the condition or thing by its nature may be fairly, though not indisputably, regarded as noxious, harmful or prejudicial to the public health, comfort or interest in populous centers. As to these a determination by the municipality that it is a nuisance and should be abated will usually be accepted by the courts as binding and conclusive in the absence of evidence of wrongful discrimination or abuse of discretion. We understand this to mean that summary action by the municipality will not be interfered with unless the case comes within the exception.

The third class includes those conditions or things which are not in any view of their own nature nuisances per se, but become nuisances only by reason of their location, surroundings and management, such as public picnics, open air dances, storage of cotton, operation of a steam engine and the like. To these may be added awnings over a sidewalk[4] or buildings in general.[5] These may be abated as nuisances under statutory authorization when the municipality has by general ordinance defined and classified them as such. But the courts must determine whether they are nuisances in fact, and the municipality has no power of summary abatement.

The recent second edition of McQuillin on Municipal Corporations, Vol. 2, sec. 956, p. 143, states the universal doctrine that a municipality cannot by ordinance declare and suppress something as a nuisance when it is not in fact; and then adds that some decisions restrict

---

[2] 2 Dillon on Municipal Corporations (5 Ed.), sec. 693, p. 1050; 3 McQuillin, Municipal Corporations (2 Ed.), sec. 967, p. 189, note 13; 43 C. J., sec. 333, p. 314; 46 C. J., sec. 79, p. 390, sec. 198, p. 711; 39 Am. Jur., sec. 64, p. 347, sec. 66, p. 349; Annotations in 50 A. L. R. 1021, L. R. A. 1917C, 212; 28 L. R. A. 122; 38 L. R. A. 332; State ex rel. Renfrow v. Service Cushion Tube Co., 316 Mo. 640, 644-5, 291 S. W. 106, 108 (4-6); Kays v. City of Versailles, supra, 224 Mo. App. 178, 180-182, 22 S. W. (2d) 182, 183; State ex rel. Lamm v. Mid-State Serum Co. (Mo. App.), 272 S. W. 99, 100 (1, 2); Whipple v. McIntyre, 69 Mo. App. 397, 402.

[3] 46 C. J., sec. 5, p. 649, notes 57-60; 39 Am. Jur., sec. 11, p. 290, note 3.

[4] Brown v. Town of Carrollton, 122 Mo. App. 276, 99 S. W. 276.

[5] Lux v. Milwaukee Fire Ins. Co., 322 Mo. 342, 346, 15 S. W. (2d) 343, 345(2), 16 S. W. (2d) 595, 597.

the municipal power to those things which have been regarded as nuisances at common law or are so stigmatized by statute, while many other cases hold that if the municipality has the power of determination its conclusion is binding. The text accepts as the true rule, the doctrine that where the particular thing declared against is a nuisance per se, the action of the city authorities is conclusive. And the further statement appears in sec. 959, p. 151, that the right of summary abatement of public nuisances (without judicial proceedings) existed at common law, and generally has not been impaired by the constitutions, statutes and decisions of the several states. See also 39 Am. Jur., secs. 183-185, pp. 454-459.

Our own conclusion is that where (as here) the statute has authorized the municipality summarily to suppress or abate the particular thing (stockyards, pigpens and cow stables) and any business which is dangerous or detrimental to the public health, further definition by ordinance is unnecessary—especially when the case law of this and other states has declared it to be a nuisance by virtue of its own nature in an environment such as was shown by the evidence accepted by the chancellor below. Our case law may become our common law. State ex rel. Schlueter Mfg. Co. v. Beck, 337 Mo. 839, 847, 85 S. W. (2d) 1026, 1029. Two Missouri decisions, the Versailles case and the Whipple case cited in marginal note 2, have held that the keeping of hogs in a thickly built part of a city or in filth close to a neighbor's dwelling is a nuisance per se.

A contrary view would mean that in such instances the general city ordinance would have to delineate the general facts which would make the act a nuisance, when our decisions have already done so. And if there were no right of summary abatement, the city would be compelled to bring a lawsuit in each instance instead of casting the burden on the offender to enjoin. Appellant here had notice and a hearing before the council. He is now availing himself of a right of judicial review. Under the facts of this case we think that is all he is entitled to, procedurally.

The remaining question is whether the respondent city is estopped by its own alleged laches. On the merits this evidence is indefinite and not entirely convincing. Further, it cuts both ways, for it shows there have been complaints about appellant's stock pen over over a considerable period of time, extending back even to when it was in its former location. It appears also that the city has been growing and the neighborhood becoming more populous. Mere indulgence is not necessarily laches. The city had nothing to gain. Appellant cannot preempt the whole vicinity—not even by polluting the air and imperiling the health of incoming neighbors. Neither is its argument persuasive that it will have to move its whole main office and freight terminal if the stock pen be relocated outside of or on the edge of

town, because it would lose money in employing a special attendant for that the latter might cheat.

But the legal impediment to appellant's contention is that as against a public nuisance, especially one affecting the public health, peace and comfort, the doctrine of laches is not applicable. 46 C. J., sec. 386, p. 777. The right to commit a public nuisance cannot be acquired even by prescription. The city authorities cannot thus surrender the municipality's right and obstruct performance of its duty to protect the vital public welfare. 46 C. J., sec. 349, p. 751; 39 Am. Jur., sec. 201, p. 476; Smith v. Sedalia, 152 Mo. 283, 301-2, 53 S. W. 907, 911, 48 L. R. A. 711; State ex rel. Hopkins v. Excelsior Powder Mfg. Co., 259 Mo. 254, 284, 169 S. W. 267, 275, L. R. A. 1915A, 615; Riggs v. Springfield, 344 Mo. 420, 437(4), 126 S. W. (2d) 1144, 1153, 122 A. L. R. 1496; State ex rel. Detienne v. City of Vandalia, 119 Mo. App. 406, 426, 94 S. W. 1009, 1014.

This disposes of all the assignments of error. For the reasons stated the judgment is affirmed. All concur.