**OLYMPIC DRIVE–IN THEATRE, INC., a Corporation, Plaintiff-Appellant,**

v.

**CITY OF PAGEDALE, a Municipal Corporation, Defendant-Respondent.**

**No. 53490.**

Supreme Court of Missouri, Division No. 1.

May 12, 1969.

**6**

Wion, Burke & Boll, Clayton, for defendant-respondent.

Richard Wolff, St. Louis, for plaintiff-appellant.

SEILER, Judge.

In 1961 plaintiff corporation built its drive-in theatre on a 10 or 11 acre tract in the southeast corner of St. Charles Rock Road and Kingsland Avenue in Pagedale, a city of the fourth class, population 5,106, in St. Louis County.[1] There is a residential area west of the drive-in. There is industrial property on the south and the Wabash

---

1. The drive-in would hold approximately 869 automobiles. The cost of construction was $130,000. The building plans were first submitted to the city officials and after Kingsland Avenue was widened at the expense of plaintiff and the demands of the state highway department met as to "stacking space" for cars entering the drive-in from the highway (St. Charles Rock Road is state highway 180), the city issued its building permit, January 19, 1961. It also issued plaintiff a license to operate a drive-in theatre.

Railway tracks are on the east and north. The 80 feet by 40 feet movie screen was located in the southeast corner of the tract, some 1,200 feet from the intersection. The drive-in was built with redwood screening fences 6 feet high along the perimeter on both streets, but nevertheless all or portions of the upper part of the screen could be seen from St. Charles Rock Road (which was about 30 feet higher than the base of the screen) up to within 200 feet or so east of the intersection, and from Kingsland Avenue at points 800 feet or more south of the intersection. The screen was visible from the front yards and porches of some of the residences on the west side of Kingsland, to varying degrees, depending upon the season and foliage. The city officials testified plaintiff's manager told them he was going to show first-run films, which they took to mean family-type movies, but that soon "adult" or "art" movies were being shown, with occasional westerns, horror shows and comedies.

The aldermen began receiving complaints, which reached a peak in 1965. There was one board of aldermen meeting attended by about 50 residents and a protest meeting in the high school attended by around 900 people. The board was under considerable pressure to do something about the drive-in. At the September 28, 1965 board meeting, the then mayor stated the city would do everything it could to build up a case against the drive-in, that "either they straighten up or go out of business". One alderman, who later became mayor, said as far as he was concerned, the theatre's current license would not be renewed upon expiration. There is a mass of testimony in the record about complaints, some based on personal knowledge and others not. Much of the testimony was received by the trial court on the theory that it represented legislative research done by the board in connection with the ordinances subsequently adopted. In summary, the complaints to the aldermen were from two groups: those living along the west side of Kingsland (and city officials who made observations for purposes of evidence) who complained about noise, dust, cars parked in front of their houses with the occupants watching the pictures and throwing beer cans in their yards, increased traffic, and instances of nudity or semi-nudity on the screen which they could see from their homes and which youngsters could see from the street or the yards. These people had personal knowledge of what they complained about. The other group was those who lived elsewhere, some outstate, and who attended meetings sponsored by committees and signed petitions protesting against the movies shown. Most of these had little or no personal knowledge of what they complained about.

There was no testimony as to what the plot or story was of any of the movies where the nude or semi-nude scenes were observed or what their connection was with the picture as a whole. Some of the scenes observed were evidently of a nudist colony, because they showed men, women, and children playing volleyball.

In December 1965, and January 1966, Pagedale passed four ordinances which plaintiff attacked by the declaratory judgment proceeding now before us, contending the ordinances were designed to put it out of business and were unconstitutional in various respects.

The first ordinance, no. 317, was an amendment to the original drive-in theatre ordinance passed in 1951. The amendment provided that any drive-in theatre license could be revoked or suspended by the mayor, after notice and hearing, for several causes, including the one under attack here, to-wit, conduct of the business "so as to constitute a nuisance by reason of noise or immoral activity on the premises".

The second ordinance, no. 318, amended the drive-in ordinance to provide that the screen must be located so that "the pictures projected thereon are not visible from any public highway, street, or thoroughfare", or, alternatively, that the licensee "provide a wall or fence of adequate height to con-

ceal the pictures projected on the screen from view on any public highway, street, or thoroughfare". There was no "grandfather" or exemption clause for drive-ins already in existence. The evidence was it would cost plaintiff $252,000 to relocate its screen where it could not be seen from the highway, which would involve reversing the layout of the drive-in and substantial changes in the configuration of the ground, or $260,000 to $280,000 if plaintiff took the alternative of fencing.

The third ordinance, no. 320, levied a tax of 5% of the admission price on each customer of various classes of amusement businesses, to be collected by the operator. Of all the classes named, the only business in operation in Pagedale which fell into any of the classes was the plaintiff's. The ordinance was declared invalid by the trial court and has dropped out of the case because the city did not appeal.

The fourth ordinance, no. 322, further amended the drive-in theatre ordinance by prohibiting operation of the theatre when the temperature was 45° or lower, unless at least 75% "of the parking spaces for automobiles therein are equipped with in-car heaters". Plaintiff's evidence was it would cost $111,800 to comply with the ordinance. A completely new electrical system would be needed for the added load, in addition to the heaters. As opposed to this the city offered the admission of plaintiff's manager that it would cost $100 per car for heaters. This would amount to $65,000.

The mayor testified the first two ordinances were adopted as result of the complaints received by the board, but that the last two were not.

The trial court held the first, second, and fourth ordinances were valid and applicable to plaintiff. The city has suspended enforcing the ordinances pending the outcome of this litigation.

██ As to the first ordinance, no. 317, the portion under attack is too vague and indefinite to be valid. No one can tell by what standards the mayor is to decide whether activity on the premises was immoral. The mayor can make these words mean just what he wants them to mean. The mayor might consider going to a drive-in theatre on a Sunday as immoral activity. There is no specification as to whose immoral activity is to be judged. Unless the theatre operator had a watchman or a closed circuit television system for each vehicle, there would be no way the operator could know what the occupants of the cars were doing while the movie was on. Yet under the ordinances the mayor might see fit to regard the activity of patrons as ground for revocation. The ordinance would permit the mayor to conclude that any particular movie or some portion thereof was a form of immoral activity on the premises and accordingly cause for revocation of the license. See State v. Furio, 267 N.C. 353, 148 S.E.2d 275, where the court held invalid as too vague and indefinite an ordinance prohibiting any movie screen visible from the street on which any nude or semi-nude pictures were projected which were "vulgar, indecent or offensive to the public morals". The fact that he is the mayor and an elective official does not change the fact that the ordinance gives him an arbitrary power without any definite standard or rule for his guidance. Ordinances " ' * * * should not be so worded as to leave their substantive elements to the caprices of either judge or jury' ", Diemer v. Weiss (banc) 343 Mo. 626, 122 S.W.2d 922, 923. The range is unlimited as to what the mayor might hear, see, or otherwise observe or be told about in a hearing, either occurring on or off the screen, and which he might consider to be immoral activity. As Mr. Justice Clark points out in his concurring opinion in Kingsley International Pictures Corp. v. Regents, 360 U.S. 684, 701, 79 S.Ct. 1362, 1372, 3 L.Ed.2d 1512, "This is nothing less than a roving commission in which individual impressions become the yardstick of action and result in regulation in accordance with the beliefs of the individual censor rather than regulated by law."

As to the "noise" part of the ordinance, again the ordinance is too vague and indefinite. It does not set any standards as to how much noise or for how long continued, or any limits or areas where the noise is to be considered or state what persons are to be considered by the mayor in judging the effect of the noise. Again the determination is left entirely to the individual reactions and impressions of the mayor with no objective standard provided by which he is to test the noise or by which the operators may guide themselves in what they can and cannot do.

The ordinance is not saved by its reference to nuisance. Section 79.370, RS Mo 1959, gives the city the power to pass ordinances for the prevention of nuisances and their abatement, but the city has no power to declare that to be a nuisance which is not so at common law or by statute, City of Sturgeon v. Wabash Ry. Co., 223 Mo. App. 633, 17 S.W.2d 616, or which is not in fact a nuisance, Potashnick Truck Service v. City of Sikeston, 351 Mo. 505, 173 S.W. 2d 96, 100. The words "so as to constitute a nuisance" add nothing to the validity of the ordinance, because in order for the mayor to decide whether the conduct of the business constitutes a nuisance for which he may revoke the license, the only test is "noise or immoral activity on the premises", which as we have previously held, is too vague and indefinite to serve as a base for punitive action by the mayor. We hold the portion of ordinance no. 317 under consideration is invalid.[2]

The second ordinance, no. 318, is also invalid as applied to plaintiff. Plaintiff built its drive-in under the city's permit and put its screen where it was apparent it could be seen from the adjacent streets.[3] For four years plaintiff had been conducting its business lawfully with respect to location of its screen and the amount of fencing around its premises. Such use of the premises was a vested right of which the city could not arbitrarily deprive plaintiff, State ex rel. Capps v. Bruns (Mo.App.) 353 S.W.2d 829, 830–31. Ordinance no. 318 presents plaintiff with the choice of investing an additional $250,000 to $280,000 or closing down.[4] The evidence was that the business could not raise any such amount of additional capital. The situation is comparable to the attempted termination of a pre-existing lawful nonconforming use of property, which the zoning cases have held to be an unconstitutional taking of private property without due process of law and a deprivation of prior vested property rights, Hoffman v. Kinealy (Mo.Sup. banc) 389 S.W.2d 745. In Mc-Quillan on Municipal Corporations, on the subject of municipal licenses and permits, it is stated, "Substantial work done, expenditures made or obligations incurred under a license or permit, or other substantial change of position, generally will protect a licensee or permittee * * * where the

2. Ordinance no. 317 contains a provision for a right of appeal, with notice and a further hearing, to the board of aldermen, whose order is to be final. However, the ordinance does not specify any grounds or causes whatever for revocation by the board, which makes it even more vague and indefinite, or, if we assume the grounds set forth for the mayor also apply to the board on appeal, then the same legal infirmities are present as in his case.

3. The ordinance under which plaintiff secured its original license required the applicant to submit building plans and specifications for approval before any construction commenced. The ordinance carried a definition of a drive-in theatre,

which contained no requirement for screening or for location of the screen so that it could not be seen from adjacent streets and highways. In fact, the ordinance refers to a screen " * * * on which moving pictures are displayed to the general public * * *." There is nothing in the ordinance to place the licensee on notice that the city had any interest in whether the pictures could be seen on nearby streets or highways.

4. This would be twice what plaintiff invested to start with. Furthermore, aside from enabling plaintiff to comply with the ordinance, the added investment would in no way increase plaintiff's revenues or profits.

business, activity or thing licensed is lawful, and useful or harmless in character and beyond municipal power to prohibit completely * * *", Vol. 9, Sec. 26.82, pp. 197–98. The same work also states, "The enactment of a police ordinance prohibiting that which is authorized under an outstanding permit or license generally will constructively revoke that license or permit unless there has been substantial work done, expenditures made or obligations incurred in reliance on the license or permit and the business, activity or thing authorized is lawful and useful or harmless in character and beyond the power of the municipality to prohibit completely * * *", Vol. 9, Sec. 26.86, pp. 205–06.

There was some testimony ordinance no. 318 was in the interest of traffic safety, but the evidence in support of this theory was vague and inconclusive. The record is much more convincing that the board, by ordinance no. 318, was endeavoring to satisfy the demands of the citizens that something be done about the plaintiff showing pictures of nudes and semi-nudes which could be seen from the streets and nearby residences by anyone who cared to look, including youngsters. Assuming, without deciding, that such a situation is within the power of the board to control by a properly drawn ordinance, ordinance no. 318 cannot be justified on such basis, because it is much more sweeping in its requirements: it requires the drive-in theatre operator to locate his screen or erect fences so that the movies cannot be seen from the streets or highways no matter what kind of picture is being shown. It is not an ordinance such as was upheld in the case relied on by the city, Chemline, Inc. v. City of Grand Prairie (C.C.A. 5) 364 F.2d 721, where the ordinance made it unlawful for the operator to exhibit any motion picture, "which is visible from any public street or highway in which the bare buttocks or the bare female breasts of the human body are shown or in which striptease, burlesque or nudist-type scenes constitute the main or primary material."

Returning to the possible justification that it is an ordinance for traffic safety, there is no showing in the record of any danger along this line to public health, safety and welfare such as would justify an invasion of plaintiff's vested right to continue operating the drive-in in the same physical form and arrangement as it has done over the four years in question. The required fencing or change of location of screen called for by ordinance no. 318 would not relieve the problem of traffic congestion on the public streets caused by automobiles entering and leaving the theatre. This would continue no matter where the screen was or how high the fences were. It might reduce the parking of automobiles along Kingsland, but this sort of parking to see the picture show without paying admission took place a considerable distance south of the intersection of Kingsland and St. Charles Rock Road and there is no substantial evidence it caused any traffic hazard. Furthermore, such on-street parking could easily be eliminated by enforcement of the existing parking ordinance against it.

The courts have the right to inquire into the reasonableness of a police power ordinance, Union Cemetery Ass'n. v. Kansas City, 252 Mo. 466, 161 S.W. 261, 271, to a greater extent than in the case of a statute, City of Carthage v. Block, 139 Mo.App. 386, 123 S.W. 483, 484, and on the record before us, we conclude that ordinance no. 318 is unreasonable, oppressive and confiscatory as to plaintiff and cannot be upheld.

On the other hand, as to the fourth ordinance, no. 322, requiring in-car heaters, the requirement is more reasonable and one with which plaintiff could live. There is a reasonable relationship between public safety and welfare of the residents of the city and a requirement that under certain conditions, in-car heaters be available in drive-in movies. This would tend to eliminate the possibility that the customers would rely on their automobile heaters for

heat with the accompanying possibility of carbon monoxide asphyxiation. The in-car heater requirements apply only when the temperature is 45° or lower and apply only to 75% of the parking spaces. Thus, during many months of the year the ordinance would not apply at all and when the temperature got colder the operator could discontinue operations without having to go completely out of business if he did not want to install the in-car heaters. Ordinance no. 322 is, therefore, valid and applicable to plaintiff.

Judgment is reversed as to Counts I and II and affirmed as to Count IV and the cause remanded for further proceedings consistent herewith.

All of the Judges concur.