Harry E. O'DELL, Jr., a minor, by his parents and next friends, Harry E. O'Dell, Sr., and Joyce Floray, et al., Appellants,

v.

SCHOOL DISTRICT OF INDEPENDENCE, Missouri, Respondent.

No. 57474.

Supreme Court of Missouri, En Banc.

March 10, 1975.

Rehearing Denied April 14, 1975.

Albert J. Yonke, Yonke & Shackelford, Kansas City, for appellants.

Rufus Burrus, Independence, for respondent.

John C. Danforth, Atty. Gen., Richard E. Vodra, Asst. Atty. Gen., Jefferson City, for Amicus Curiae.

DONNELLY, Chief Justice.

This is an action for damages involving the governmental immunity rule.

Plaintiffs' petition against the School District of Independence, Missouri, alleges that on February 3, 1971, Harry O'Dell, Jr., while a student at William Chrisman Senior High School, and while participating in wrestling practice, was injured when a physical education coach applied an illegal wrestling hold on him.

Plaintiffs' petition was dismissed by the trial court and plaintiffs appealed.

In their brief, plaintiffs come directly to the point and "assign as error the ruling of this court that the doctrine of governmental immunity from the consequences of negligence applies to school districts and other units of government, thereby depriving them and other injured persons of the basic right to recover damages for negligence from the state and its subdivisions."

On September 10, 1973, in Watson v. Kansas City, 499 S.W.2d 515 (Mo. banc 1973), the doctrine of governmental immunity came under oblique scrutiny in this Court. In *Watson*, Judge Finch filed a concurring opinion in which he again expressed his belief "that in an appropriate case we should reexamine the doctrine of governmental immunity." On March 14, 1974, the instant case was recognized as an appropriate case for such reexamination and it was transferred from Division One of this Court to the Court en Banc on the Court's own motion. On July 22, 1974, Rennie et al. v. Belleview School District

et al., 521 S.W.2d 423, was transferred from Division Two of this Court to the Court en Banc. Both cases were heard September 24, 1974, by the Court en Banc.

The two most recent frontal attacks in this Court on the doctrine of governmental immunity were made in Smith v. Consolidated School District No. 2, 408 S.W.2d 50 (Mo. banc 1966), and Payne v. County of Jackson, 484 S.W.2d 483 (Mo.1972). In *Smith*, this Court declined to abolish the doctrine, and said (1. c. 54):

"For more than a century the courts of Missouri have uniformly held generally that political subdivisions of the state are not subject to liability in suits for negligence. Reardon v. St. Louis County, 36 Mo. 555; Clark v. Adair County, 79 Mo. 536; State ex rel. Jordon v. Haynes, 72 Mo. 377; Cassidy v. City of St. Joseph, 247 Mo. 197, 152 S.W. 306; Lamar v. Bolivar Special Road District, Mo.Sup., 201 S.W. 890; Zoll v. St. Louis County, 343 Mo. 1031, 124 S.W.2d 1168; Todd v. Curators of University of Missouri, 347 Mo. 460, 147 S.W.2d 1063; Cullor v. Jackson Township, Putnam County, Mo. Sup., 249 S.W.2d 393. School districts are political subdivisions of the state. Art. 10, § 15, Constitution of Missouri, V.A.M.S., § 70.210, RSMo 1959, V.A.M.S. As such, school districts have long been held immune from liability in tort for negligence. Cochran v. Wilson, 287 Mo. 210, 229 S.W. 1050; Krueger v. Board of Education of City of St. Louis (Banc), 310 Mo. 239, 274 S.W. 811, 40 A.L.R. 1086; Dick v. Board of Education of City of St. Louis, Mo.Sup., 238 S.W. 1073. Our holdings have been so uniform that nothing is to be gained by restating the reasons for and against the doctrine of sovereign immunity."

In *Payne*, the Court relying primarily on Cullor v. Jackson Township, Putnam County, 249 S.W.2d 393 (Mo.1952), Fette v. City of St. Louis, 366 S.W.2d 446 (Mo. 1963), and the *Smith* case, supra, declined

to abolish the doctrine, and said (484 S. W.2d 483, 486):

"We are not unaware that the doctrine of sovereign immunity continues to be under bitter assault and violent attack by some writers and law review commentators. We also recognize that in some jurisdictions the immunity doctrine has been abrogated in whole or part by courts or legislatures. In 18 jurisdictions which have judicially undertaken to weaken or abolish such immunity a quick retreat was thereafter taken by several of the courts and in seven of these jurisdictions the legislatures enacted comprehensive legislation. 56 Iowa Law Review 930–993 (1971).

"Plaintiffs say the doctrine is 'illogical and unjust doctrine, universally deplored . . . an aged survivor of Legal History, born in antiquity and kept viable only by stare decisis and inertia' and that the trend since our decision in *Cullor* has been for the courts to take the lead in restricting or wholly abolishing the doctrine. We believe that instant plaintiffs overlook the reasons for the doctrine that were again spelled out in *Cullor* and *Smith* by this court. Plaintiffs' contentions also fail to consider that in the jurisdictions referred to a careful state by state analysis is necessary to determine the extent of abrogation, including: the governmental entitites affected; the nature and meaning of exceptions to liability, the impact of new law on prior statutes and decisions, the retroactive effect of new law; and, subsequent court decisions and legislative acts in such jurisdictions.

"As we observed in the *Fette* and *Smith* cases, the abolition of the doctrine of sovereign immunity opens up a Pandor's box of complex and possible chaotic problems that we, in the exercise of judicial restraint, believe the legislature to be better equipped to solve than the judiciary."

It is generally agreed that the first diminution in stature of the doctrine of sovereign immunity came in Hargrove v. Town of Cocoa Beach, 96 So.2d 130 (Fla.1957), in which the Court abolished sovereign immunity as to municipalities in Florida, declaring that "[T]o continue to endow this type of organization with sovereign divinity appears to us to predicate the law of the Twentieth Century upon an Eighteenth Century anachronism." Other state courts proceeded to follow the leadership given by Florida. Most, if not all, are noted in Ayala v. Philadelphia Board of Public Education, 453 Pa. 584, 305 A.2d 877 (1973). Although our own research does not fully agree with the categorization of jurisdictions in *Ayala*, the jurisdictions listed therein purporting to follow the *Hargrove* case are generally noteworthy, in our opinion, for at least three reasons: (1) the zeal with which each strives to surpass the eloquence of its predecessors in damning the doctrine of sovereign immunity; (2) their unquestioning assumption that "the historical roots of the governmental immunity doctrine are found in the English case of Russell v. Men of Devon, 2 T.R. 667, 100 Eng.Rep. 359 (1778)," *Ayala*, supra, l. c. 879; and (3) their reasoning that "the doctrine of governmental immunity—judicially imposed—may be judicially terminated." *Ayala*, supra, l. c. 885.

We believe it would serve no useful or proper purpose for us to question the reasoning employed by the opinions cited in *Ayala*, supra. It is sufficient to say that the views they, and the *Ayala* opinion, express conflict with the public policy of Missouri, as articulated in our Constitution, in our statutory law, and in our judicial decisions.

The common law of England was adopted in Missouri by an act of the Third Territorial Assembly on January 19, 1816. The Act read, in part, as follows:

"1. The common law of England, which is of a general nature, and all statutes made by the British parliament

in aid of or to supply the defects of the said common law, made prior to the fourth year of James the First, and of a general nature, and not local to that kingdom, which said common law and statutes are not contrary to the laws of this territory, and not repugnant to, nor inconsistent with the constitution and laws of the United States shall be the rule of decision in this territory, *until altered or repealed by the legislature,* any law, usage, or custom to the contrary notwithstanding, . . . ." (Emphasis supplied.)

In 1825, the italicized language, *supra,* was deleted by the legislature (RSMo 1825, p. 491), and the remainder has been carried forward to the present. It is now a part of § 1.010, RSMo 1969, V.A.M.S. "When Missouri came into the Union of the states under its first Constitution, it brought with it the common law which it had adopted as a territory in 1816." Elks Investment Co. v. Jones, 187 S.W. 71, 74 (Mo.1916). "The statute by which we adopted the common law of England specifically includes only the common law in force prior to the fourth year of the reign of James the First, * * * which was the year 1607, * * *." Osborne v. Purdome, 244 S.W. 2d 1005, 1011 (Mo. banc 1951).

The first question presented is: what was the "general nature" of the common law of England with reference to sovereign immunity prior to the year 1607? We are indebted to the Supreme Court of Wyoming, and its research reflected in Maffei v. Incorporated Town of Kemmerer, 80 Wyo. 33, 338 P.2d 808, 810, 811 (1959) for the answer to the question. The members of the Court in Wyoming were inhibited by a statute similar in wording to the 1816 version of Missouri's § 1.-010, *supra.* The Wyoming court noted the *Hargrove* case, *supra,* and said:

"We interpret these expressions as meaning the Florida court considered the doctrine of municipal immunity originated by virtue of pronouncement made

in Russell v. The Men of Devon, 2 T.R. 667, 100 Eng.Rep.R. 359. We believe that assumption is not justified because of what was said in the opinion in the Devon case, which was an action in which an individual sought recovery against the inhabitants of a county for injuries sustained because of alleged negligence of the county. In the major opinion at 2 T.R. 673, 100 Eng.Rep.R. 362 it was said:

"'* * * there is no law or reason for supporting the action; and there is a *precedent against it in Brooke:* though even without that *authority* I should be of opinion that this action cannot be maintained.' (Emphasis supplied.)

"To the same effect the concurring opinion said at 2 T.R. 673, 100 Eng.Rep.R. 363:

"'* * * However there is no foundation on which this action can be supported; and if it had been intended, the *Legislature* would have interfered and given a remedy, as they did in the case of hue and cry. Thus this case stands on principle: but I think *the case cited from Brooke's Abridgment is a direct authority* to shew that no such action could be maintained; and the reason of *that case* is a good one, namely, because the action must be brought against the public.' (Emphasis supplied.)

"While we have been unable to find the full report of the case abridged by Brooke, the language used by the opinion writers in the Devon case clearly indicates that antecedent to Russell v. The Men of Devon, *supra,* a previous judicial pronouncement had recognized the doctrine of municipal immunity. We do find, however, in II Holdsworth's History of English Law, 3d ed., p. 545, a reference stating the author of Brooke's Abridgements died in 1558. So it is clear the early decision Brooke abridged was made before that year."

We have done additional research and have concluded (1) that prior to Sir Robert Brooke's La Graunde Abridgement in 1573, the "general nature" of the common law of England was that an action could not be maintained for negligence *against the public*; and (2) that this principle of the common law was *applied* by the judges in Russell v. The Men of Devon in 1788 in an action upon the case against the men dwelling in the county of Devon. We cannot agree with the proposition that the doctrine of sovereign immunity *originated* with *Men of Devon*.

■ We believe and hold that the common law adopted in Missouri when it came into the Union of states was that an action cannot be maintained for negligence *against the public*.

In Reardon v. St. Louis County, 36 Mo. 555, 562, 563 (1865), this Court, as did the court in *Men of Devon*, applied this principle of the common law and accepted the concept that entities, "created by the Legislature for purposes of public policy, are not responsible for the neglect of duties enjoined on them unless the action is given by the statute." In Cochran v. Wilson, 287 Mo. 210, 223, 229 S.W. 1050, 1053, 1054 (1921), this Court applied the same concept to school districts, and classified them as "instrumentalities engaged in the performance of governmental functions, and hence subject to the same rules as to nonliability for negligence as other subdivisions of the State charged with the performance of like duties." These, and other, opinions of this Court, in treating the question presented here, have consistently reflected what is said in Art. I, § 1 of our Constitution, V. A.M.S., by which the people of Missouri declared:

"That all political power is vested in and derived from the people; that all government of right originates from the people, is founded upon their will only, and is instituted solely for the good *of the whole*." (Emphasis supplied.)

The question then becomes: having determined that the common law adopted in Missouri when it came into the Union of states was, and has continued to be, that an action cannot be maintained for negligence *against the public,* (1) does this Court have the power to abrogate such doctrine; and (2) if so, should we do so?

It would seem arguable that, with the deletion in 1825 of the words "until altered or repealed by the legislature," from the Act of 1816, supra, the legislature intended to give the courts some flexibility in our applications of what is now § 1.010. However, we need not, and should not, definitively answer that question in this case. It is enough to say that, *if* we have such power, we decline to assert it in this case involving so fundamental a doctrine as sovereign immunity.

■ Many of those who urge abolition of the doctrine of sovereign immunity attribute its origin to the theory that "the King can do no wrong," and then proceed to discredit the doctrine by noting "the fact that the Revolutionary War was fought to abolish that 'divine right of kings' on which the theory is based." Molitor v. Kaneland Community Unit District No. 302, 18 Ill.2d 11, 163 N.E.2d 89, 94 (1959). We consider such exhortations irrelevant. In Missouri, the people are sovereign. The immunity is theirs. By adoption of our Constitution, the people of Missouri assented to be governed and established the terms of the grant. They authorized the creation of governmental entities for the performance of tasks considered essential to their general welfare. In our view, in order that such entities remain viable, it must be recognized that the immunity of the sovereign people must pass to those governmental entities which serve the public interest. It is vigorously argued that allowing a cause of action against the state and its subdivisions would not injuriously affect their viability and their capacity to adequately and efficiently serve the public. We express no view on this question because we believe it is a question

so fundamental as to require determination by the people or their representatives in the General Assembly.

There are other factors which suggest the exercise of judicial restraint in this case.

In Missouri, unlike most other states, we must recognize that the doctrine of sovereign immunity, as demonstrated above, is legislative-made (under § 1.010), and not court-made. This factor gives rise to judicial inhibitions not present when the law in question is court-made (Cf. Abernathy v. Sisters of St. Mary's, 446 S.W.2d 599 (Mo. banc 1969)). Historically, judges of this Court have exhibited much reluctance when urged to strike down legislative-made law unless it is found to violate the Constitution.

In 1959, the General Assembly enacted a statute (§ 71.185, RSMo 1969, V.A.M.S.) which deals with the liability of municipalities, and which reads as follows:

"1. Any municipality engaged in the exercise of governmental functions may carry liability insurance and pay the premiums therefor to insure such municipality and their employees against claims or causes of action for property damage or personal injuries, including death, caused while in the exercise of the governmental functions, and shall be liable as in other cases of torts for property damage and personal injuries including death suffered by third persons while the municipality is engaged in the exercise of the governmental functions *to the extent of the insurance so carried.*

"2. In all suits brought against the municipality for tort damages suffered by anyone while the municipality is engaged in the exercise of governmental functions, it shall be unlawful for the amount of insurance so carried to be shown in evidence, but the court shall be informed thereof and shall reduce any verdict rendered by a jury for an amount in excess of such insurance to the amount of the insurance coverage for the claim." (Emphasis supplied.)

In 1969, the General Assembly enacted statutes (§ 105.800–105.850, Laws 1969), which extended the provisions of chapter 287, RSMo, V.A.M.S. (the workmen's compensation law) to state employees. Section 105.850 reads as follows:

*"Nothing in sections 105.800 to 105.850 shall ever be construed as acknowledging or creating any liability in tort* or as incurring other obligations or duties except only the duty and obligation of complying with the provisions of chapter 287 RSMo." (Emphasis supplied.)

In 1971, the General Assembly enacted a statute (§ 226.092, Laws 1971), which authorizes the state highway commission to provide liability insurance for employees, and which reads as follows:

"The state highway commission is authorized, when considered by it to be in the public interest, to acquire and to pay for, as part compensation to the employee involved, liability insurance covering the operation of state-owned vehicles involved in the performance of operations of the commission. *The immunity in tort actions of the state and the state highway commission shall not be in any way affected by this section."* (Emphasis supplied.)

In 1973, the General Assembly enacted statutes (§ 34.260–34.275, Laws 1973), which directed the state purchasing agent to procure motor vehicle and marine liability insurance covering the operation of state-owned vehicles and vessels by state employees in the course of their employment. Section 34.275 reads as follows:

*"Nothing in sections 34.260 to 34.275 is intended to nor shall it be construed as a waiver of sovereign immunity* or the acknowledgment or creation of any liability on the part of the state for personal injury, death, or property damage." (Emphasis supplied.)

We consider the continued reenactment of § 1.010, supra, and the enactments of 1959, 1969, 1971, and 1973, noted above, as positive statements by the General Assembly of its view that the general concept of sovereign immunity should be retained in Missouri. We cannot say, under these circumstances, as concluded in other states, that the Missouri legislature has remained idle and unresponsive to this very important issue.

In the face of all this, should this Court abrogate the doctrine of sovereign immunity generally or, in particular, as applied to school districts? We think not.

Plaintiffs finally assert that the doctrine of sovereign immunity denies them equal protection of the law and due process, and that the "Tort Defense Fund" (§ 105.710, Laws 1973) denies them equal protection of the law. The "Tort Defense Fund" was created to provide a limited form of indemnification to certain state officers, employees, and members of the National Guard against judgments awarded against them.

█ We are of the opinion that plaintiffs' assertion is without merit. Persons who seek recovery for negligence against a private tort-feasor and persons who seek recovery under the "Tort Defense Fund" are different classes of persons from those who seek recovery for negligence against the state or its political subdivisions. They are not similarly situated and they may be treated differently. Reed v. Reed, 404 U.S. 71, 92 S.Ct. 251, 30 L.Ed.2d 225 (1971); Krause v. .State of Ohio, 31 Ohio St.2d 132, 285 N.E.2d 736 (Ohio 1972).

The judgment is affirmed.

HOLMAN, J., concurs.

MORGAN, J., concurs in separate concurring opinion filed.

HENLEY, J., concurs and concurs in separate concurring opinion of MORGAN, J.

FINCH, J., dissents in separate dissenting opinion filed.

SEILER and BARDGETT, JJ., dissent and concur in separate dissenting opinion of FINCH, J.

MORGAN, Judge (concurring).

I believe that the doctrine of governmental immunity is vulnerable to most, if not all, of the criticisms and weaknesses so clearly and forcefully articulated in the dissenting opinion of Judge Finch. Nevertheless, I am also of the opinion that retaining or abolishing a doctrine of such historical standing is for the legislative department, which more directly reflects the wishes of the citizens of this state.

The instant question is readily distinguishable from that found in Abernathy v. Sisters of St. Mary's, 446 S.W.2d 599 (Mo. banc 1969), wherein the doctrine of charitable immunity was abolished, for the simple reason that the instant question, alone, involves the possible expenditure and disposition of tax related funds. The citizens of this state by their constitution have expressed their confidence in the legislative department to make such tax related decisions. Conversely, the judicial department should exercise sufficient restraint not to invade this legislative area.

FINCH, Judge (dissenting).

I respectfully dissent. I would hold that the School District is not immune from this tort action and would reverse and remand for trial. Because of the importance of the issue involved, I recite in some detail the reasons for that conclusion.

It is essential at the outset to determine whether the doctrine of sovereign or governmental immunity in tort in Missouri is statutory or decisional in origin, that is, whether it was created by statutory enactment or whether it constitutes what is sometimes referred to as judge-made law. The principal opinion concludes that it "is

legislative-made (under § 1.010), and not court-made." If that be true, it would be inappropriate for this court to abolish it by judicial decision unless we should find the statute creating the doctrine to be unconstitutional. On the other hand, if the doctrine in Missouri is decisional, then clearly the courts have the authority to modify or abolish a doctrine the courts created and should do so if it is found to be outmoded. Abernathy v. Sisters of St. Mary's, 446 S. W.2d 599 (Mo. banc 1969).

In researching the origin of the rule, the principal opinion concludes that prior to the year 1573, "the 'general nature' of the common law of England was that an action could not be maintained for negligence *against the public.*" It traces this rule to a case which appeared in Sir Robert Brooke's La Graunde Abridgement published in England in 1573. Numerous text writers and many of the state court decisions involving some phase of governmental tort immunity trace the doctrine to the case of Russell v. The Men of Devon, 2 T.R. 667, 100 Eng.Rep. 359 (1788). If the doctrine was established by the Men of Devon case, it was not a part of the common law by 1607 (the fourth year of the reign of James I) and it was not within the scope of § 1.010.[1] However, for purposes of this dissent, I accept the conclusion of the majority that the doctrine of governmental tort immunity is traceable to an earlier case from Brooke's Abridgement and was a part of the English common law as of 1573. Therefore, it becomes necessary to determine the effect of the adoption of this common law doctrine by § 1.010.[2]

What is now § 1.010 was adopted by the Missouri legislature in 1825 (Ch. I, RSMo 1825, p. 491). This new law provided that the English common law of a general nature as it existed prior to the year 1607 (the date of the first permanent English colonization in America) was to be the rule of decision in Missouri, provided it was not inconsistent with federal and state constitutions, or with Missouri statutory provisions. The act was substantially the same as one adopted in Virginia shortly after the Declaration of Independence and thereafter in several other American states.[3] It was enacted in Virginia for the purpose of supplying a body of judicial precedent for guidance of its courts and officials.[4]

When Missouri became a state, it created a new governmental structure, including its judicial system. The new courts of Missouri necessarily started with no body of decisional law of their own. There was no prior Missouri judicial precedent except as the courts might look to decisions of the territorial courts. It seems perfectly clear to me that the state's general assembly, following the example of Virginia, enacted what is now § 1.010 for the purpose of filling this void, thereby providing the state with a body of decisional law consisting of the English common law as it existed in 1607.

---

1. All statutory references are to RSMo 1969, V.A.M.S. unless otherwise indicated.

2. The full text of § 1.010 is as follows:
    "The common law of England and all statutes and acts of parliament made prior to the fourth year of the reign of James the First, of a general nature, which are not local to that kingdom and not repugnant to or inconsistent with the Constitution of the United States, the constitution of this state, or the statute laws in force for the time being, are the rule of action and decision in this state, any custom or usage to the contrary notwithstanding, but no act of the general assembly or law of this state shall be held to be invalid, or limited in its scope or effect by the courts of this state, for the reason that it is in derogation of, or in conflict with, the common law, or with such statutes or acts of parliament; but all acts of the general assembly, or laws, shall be liberally construed, so as to effectuate the true intent and meaning thereof."

3. Hall, The Common Law: An Account of Its Reception in the United States, 4 Vand. L.Rev. 791, 798 (1951).

4. *Id.* at 798, 799.

This interpretation of the 1825 statute is consistent with the language used therein. In the first place, the section does not say that the English common law was enacted as a statute, to be treated as a part of the statutory law of the state. Instead, it states that such common law shall be the *"rule of action and decision"* in Missouri. (Emphasis supplied.) Stated differently, it says that the English common law of a general nature as of 1607 (not repugnant to nor inconsistent with the federal or state constitution "or the statute laws in force for the time being") was to be the decisional law of Missouri. By this directive, that portion of the common law determined by the courts to meet the various qualifications and limitations specified in the act would be the state's body of judicial precedent.

Secondly, the statute does not contain the specificity necessary to establish legislatively created rights, obligations or prohibitions. For example, if the intention had been to establish the doctrine of sovereign immunity by legislative enactment, a bill spelling out the details of the rule and when it should apply would have been adopted. That is the way a legislative body enacts laws. One can then go to the title of the bill and the language in the body thereof and find out what the general assembly has adopted. An examination of what is now § 1.010 gives no inkling that it dealt with sovereign immunity or that it was intended to or did establish that doctrine as a part of the statutory law of Missouri. It specifies nothing as to what one may or may not do about suing a corporate governmental body in tort or what, if any, immunity that political entity has. It does not enable one, as a statute usually does, to read and ascertain what is authorized, prohibited or directed.

Finally, the last clause of § 1.010 confirms that the section relates to the matters of interpretation, not the establishment of substantive statutory rights and obligations. The section concludes with the words "all acts of the general assembly, or laws, shall be liberally construed, so as to effectuate the true intent and meaning thereof." Thus, the whole section deals with the decisional process, not with the creation of substantive law by express statutory enactment.

The early English common law, thus adopted as our body of decisional law, would be subject to modification or change by subsequent judicial decision the same as any other decisional law of the state. The fact that the legislature so intended is confirmed by the legislative history of the statute enacted in 1825. On January 19, 1816, while Missouri was still a territory, the Third Territorial Assembly adopted an act which was essentially the same as the one subsequently enacted in 1825 by the state's general assembly, except that it contained a clause providing that the common law was to be the rule of decision in the territory "until altered or repealed by the legislature." [5] This language indicated an apparent intention by the territorial legislature to freeze the common law as adopted unless and until it was changed by legislative action, even though it was decisional law. Thereafter, when the Constitution of 1820 was adopted, § 2 of the Schedule thereto provided that the territorial acts were carried over as laws of the new state. However, in the state's first statutory revision, mandated by Art. III, § 35, of the

---

5. That act, in so far as pertinent here, provided as follows:

"1. The common law of England, which is of a general nature, and all statutes made by the British parliament in aid of or to supply the defects of the said common law, made prior to the fourth year of James the First, and of a general nature, and not local to that kingdom, which said common law and statutes are not contrary to the laws of this territory, and not repugnant to, nor inconsistent with the constitution and laws of the United States shall be the rule of decision in this territory, *until altered or repealed by the legislature*, any law, usage, or custom to the contrary notwithstanding, * * *." (Emphasis supplied.)

1820 Constitution, the language "until altered or repealed by the legislature," which had been in the 1816 territorial act, *was deleted* from the act as it was enacted in 1825. The legislature thereby stated, in my view, that the early English common law was subject to judicial change like any other part of the decisional law of the new state and that legislative action to make changes therein was unnecessary.

The interpretation of § 1.010 which I suggest is in harmony with what this court said in State ex rel. Schlueter Mfg. Co. v. Beck, 337 Mo. 839, 85 S.W.2d 1026 (banc 1935). In that proceeding in prohibition the relator sought to prohibit the trial judge from ordering it to permit plaintiff to inspect and photograph premises where an employee allegedly contracted an occupational disease. Relator contended that the court could not authorize such inspection because there was no statutory authorization therefor and the common law of England as of 1607 did not authorize the granting of such orders of inspection. In discussing the latter contention, the court said, 85 S.W.2d at 1029:

"But granting the power of a law court to allow an inspection of the chattels or lands of an adversary litigant is a modern conception, we are convinced it is necessary to the administration of justice under modern social and economic conditions; and that the Anderson Case [State ex rel. American Mfg. Co. v. Anderson, 270 Mo. 533, 194 S.W. 268] did not go too far in saying our circuit courts have discretionary authority to exercise it—notwithstanding we have no statute so providing, and notwithstanding the English law courts did not enforce such discoveries under the common law. We are not tied inextricably to the English common law which our ancestors adopted. In Duke v. Harper, 66 Mo. 51, 60, 27 Am.Rep. 314, it was held that although this state adopted common law of England by a statute which contained no qualification that it be applicable to

our condition, still our courts are at liberty to declare that any portion of it inapplicable to our condition and circumstances does not obtain here. And earlier, in Reaume v. Chambers, 22 Mo. 36, 54, in discussing the question whether actual seizen of the wife's land is necessary to entitle the husband to curtesy, this court, in an able opinion by Scott, J., said, 'whatever may be the common law on the subject, the circumstances of the country demand a modification of the rule.'

"Neither do we understand that in exciding parts of the common law we must do so as of the date of its adoption in this state, and say so much of it never did prevail here; nor are we always limited to a mere negative right of rejection, without the power to allow an appropriate remedy in the circumstances. From time to time, with the coming of definite, general (as distinguished from local) changes in our social order, we can accommodate *our* common law to them, certainly, at least, in matters affecting the proper functioning of our courts in the administration of justice."

A like conclusion with respect to the role of the courts in applying the common law pursuant to § 1.010 is to be found in the opinion of Judge Stone in the case of La Plant v. E. I. Du Pont De Nemours and Co., 346 S.W.2d 231, 245 (Mo.App.1961), as follows:

"These closing comments are prompted by the gratuitous and brash adjuration of DuPont's counsel that we should not be concerned with the judicial, economic and social climate of our day and that our function is simply 'to find the common law of England as it existed in 1607 and the statutory modifications thereof'—* * *. Our Supreme Court has defined the common law as ' "a system of elementary rules and of general judicial declarations of principles, which are continually expanding with the progress of society, adapting themselves to the grad-

ual changes of trade, commerce, arts, inventions, and the exigencies and usages of the country." ' State ex rel. Schlueter Mfg. Co. v. Beck, 337 Mo. 839, 847, 85 S. W.2d 1026, 1029–1030. '(T)he common law is not a static but a dynamic and growing thing. Its rules arise from the application of reason to the changing conditions of society. It inheres in the life of society, not in the decisions interpreting that life * * *.' Barnes Coal Corp. v. Retail Coal Merchants Ass'n, 4 Cir., 128 F.2d 645, 648(5); Roach v. Harper, 143 W.Va. 869, 105 S.E.2d 564, 568. And, 'flexibility and capacity for growth and adaptation is the peculiar boast and excellence of the common law.' Hurtado v. People of State of California, 110 U.S. 516, 530, 4 S.Ct. 111, 118, 28 L.Ed. 232, 237; * * *. We are no more impressed than is our Supreme Court by arguments relying on 'social responsibility' and 'fairness and justice' without demonstrated legal fault [Bean v. Ross Manufacturing Co., supra, 344 S.W.2d 18 loc. cit. 25–26]; but, on the other hand, we immediately reject and emphatically deny DuPont's notion that our judiciary is so shackled and bound that its function is limited to finding 'the common law of England as it existed in

1607 and the statutory modifications thereof.' "

See also State v. Kollenborn, 304 S.W.2d 855, 862–864 (Mo. banc 1957); Byers v. Lemay Bank & Trust Co., 365 Mo. 341, 282 S.W.2d 512, 515 (1955); Yerger v. Smith, 338 Mo. 140, 89 S.W.2d 66, 74 (1935).

It has been pointed out that state common law adoption provisions similar or identical to § 1.010 have been treated fairly uniformly despite the exact statutory wording.[6] Contrary to the conclusion of the Wyoming court in Maffei v. Incorporated Town of Kemmerer, 80 Wyo. 33, 338 P.2d 808 (1959), the majority of states considering the question have overwhelmingly agreed with Missouri's rejection of the assertion that the common law was adopted as an inflexible statute.[7]

My conclusion that § 1.010 did not adopt the English common law as a substantive statute necessarily would cause me to hold that the common law doctrine of sovereign tort immunity is simply a part of our decisional or judge-made law, subject to subsequent judicial change. Having so concluded, the next question for consideration is whether the doctrine should be changed or

---

6. Hall, *supra* note 3, at 800, 805.

7. See, e. g., Burns v. Burns, 21 Ariz.App. 337, 519 P.2d 190, 192 (1974); Deshotel v. Atchison, T. & S.F. Ry., 50 Cal.2d 664, 328 P.2d 449 (1958); Layne v. Tribune Co., 108 Fla. 177, 146 So. 234, 237 (1933); Estate of Chun Quan Yee Hop, 52 Haw. 40, 469 P.2d 183, 185 (1970); Good v. Good, 79 Idaho 119, 311 P.2d 756, 759 (1957); Ney v. Yellow Cab Co., 2 Ill.2d 74, 117 N.E.2d 74, 79 (1954); Brooks v. Robinson, 284 N.E.2d 794, 797 (Ind.1972); Manzanares v. Bell, 214 Kan. 589, 522 P.2d 1291, 1300 (1974); City of Louisville v. Chapman, 413 S.W.2d 74, 77 (Ky.1967); Latz v. Latz, 10 Md.App. 720, 272 A.2d 435, 441 (1971); Beech Grove Inv. Co. v. Civil Rights Comm'n, 380 Mich. 405, 157 N.W.2d 213, 224–25 (1968); Silesky v. Kelman, 281 Minn. 431, 161 N.W.2d 631, 632–33 (1968); Mitchell v. State, 179 Miss. 814, 176 So. 743 (1937); State ex rel. Johnson v. Tautges, 146 Neb. 439, 20 N.W.2d 232, 234 (1945); Collopy v. Newark Eye & Ear Infirmary, 27 N.J. 29, 141 A.2d 276 (1958); Woods v. Lancet, 303 N.Y. 349, 354–55, 102 N.E.2d 691 (1951); Fowler v. City of Cleveland, 100 Ohio St. 158, 126 N.E. 72, 76 (1919); Truxes v. Kenco Enterprises, 80 S.D. 104, 119 N.W.2d 914, 916 (1963); Powell v. Hartford Acc. & Indem. Co., 217 Tenn. 503, 398 S.W. 2d 727, 730–31 (1966); Midkiff v. Midkiff, 201 Va. 829, 113 S.E.2d 875, 877 (1960); Strode v. Gleason, 9 Wash.App. 13, 510 P.2d 250, 252 (1973); State v. Esser, 16 Wis.2d 567, 115 N.W.2d 505, 514 (1962). See also Lutwak v. United States, 344 U.S. 604, 615, 73 S.Ct. 481, 97 L.Ed. 593 (1952); Funk v. United States, 290 U.S. 371, 383–86, 54 S.Ct. 212, 78 L.Ed. 369 (1933); Larsen v. General Motors Corp., 391 F.2d 495 (8th Cir. 1968); Durham v. United States, 94 U.S.App.D.C. 228, 214 F.2d 862, 874 n. 44 (1954).

abolished. This necessarily involves an examination of the reasons advanced for its adoption in England as well as those justifications given in earlier decisions in this state for its retention, and a determination of their present validity.

The first justification advanced in Men of Devon for denying a right to recover for negligence was that since the county was not incorporated and there were no corporate funds available, such suits would be against members of the public individually. The court stated that one or two would have to pay and they then would sue other inhabitants to seek contribution, resulting in great inconvenience to the public. Whatever validity this argument had originally has now disappeared. School districts, counties, municipalities and other governmental entities in Missouri are corporations or quasi-corporations and do have corporate funds. Suits to recover from the governmental body would be against it and not be against all the citizens individually. There would not be the suits for contribution which the court said would cause inconvenience.

A second reason stated in Men of Devon was that an action for individual injury should not be sustainable against the public because it is better that an individual should sustain and bear an injury than that the public should suffer an inconvenience. This philosophical viewpoint may have been a valid reason at that time in England, but I suggest that it is completely out of tune with present day concepts in this country and is not an acceptable justification for the rule. That kind of a standard would mean that one negligently injured while in a church should not recover from the church because it would be better for the individual to bear the loss than to impose it on the entire congregation. We have rejected this philosophy. Garnier v. St. Andrew Presbyterian Church, 446 S. W.2d 607 (Mo. banc 1969).[8]

A third basis of the doctrine, mentioned in earlier Missouri cases was the old concept that the king could do no wrong. See, e. g., Fette v. City of St. Louis, 366 S.W.2d 446, 447 (Mo.1963). Such cases necessarily assume that present day governmental entities inherited the king's immunity based on infallibility. So much has been written to discredit this justification for the doctrine that little more need be said. The Supreme Court of Illinois appropriately wrote, in Molitor v. Kaneland Community Unit District No. 302, 18 Ill.2d 11, 163 N.E.2d 89, 94 (1959):

"We are of the opinion that school district immunity cannot be justified on this theory. As was stated by one court, 'The whole doctrine of governmental immunity from liability for tort rests upon a rotten foundation. It is almost incredible that in this modern age of comparative sociological enlightenment, and in a republic, the medieval absolutism supposed to be implicit in the maxim, "the King can do no wrong," should exempt the various branches of the government from liability for their torts, and that the entire burden of damage resulting from the wrongful acts of the government should be imposed upon the single individual who suffers the injury, rather than distributed among the entire community constituting the government, where it could be borne without hardship upon any individual, and where it justly belongs.' Barker v. City of Santa Fe, 47 N.M. 85, 136 P.2d 480, 482. Likewise, we agree with the Supreme Court of Florida that in preserving the sovereign

8. See, e. g., Muskopf v. Corning Hospital District, 55 Cal.2d 211, 11 Cal.Rptr. 89, 359 P.2d 457, 459 (1961); Hargrove v. Town of Cocoa Beach, 96 So.2d 130, 132 (Fla. banc 1957); Spencer v. General Hospital, 138 U.S.App.D.C. 48, 425 F.2d 479, 487 (1969) (Wright, J., concurring); Borchard, Government Liability in Tort, 34 Yale L.J. 1, 134 (1924); Van Alstyne, Governmental Tort Liability: A Decade of Change, 1966 U.Ill.L.F. 919, 921; Note, Governmental Immunity from Tort Liability: Has the Rationale Disappeared?, 39 U.M.K.C.L.Rev. 252, 255–56 (1971).

immunity theory, courts have overlooked the fact that the Revolutionary War was fought to abolish that 'divine right of kings' on which the theory is based."

Other authorities have been in substantial accord.[9]

One of the justifications for the doctrine advanced in Brown v. City of Craig, 350 Mo. 836, 168 S.W.2d 1080, 1083 (1943), was that " * * * public officers have no authority to bind the sovereign (the whole people) except such as is given them by specific constitutional and statutory provisions. The general rules of respondeat superior cannot be applied to them without opening up unlimited possibilities for wasteful and dishonest dissipation of public funds."

I must confess that I am at a loss to understand this justification. If the suggested wasteful conduct and dishonest dissipation of funds refers to anticipated conduct on the part of claimants asserting tort claims against governmental entities, I can see no justification for concluding those plaintiffs would be any different from tort claimants seeking damages from corporations or individuals. The opinion in Brown does not suggest in what way they would be wasteful or dishonest or how such results would be accomplished. If, on the other hand, the suggestion is intended to have reference to the conduct of governmental officers and employees and to imply that they would be wasteful and would dishonestly dissipate public funds because their employer, the government, is made responsible for their authorized actions under the doctrine of respondeat superior, I would respond that this would be contrary to human experience and would not occur. The conclusion in Brown is ex-

actly opposite to our conclusion in Abernathy, 446 S.W.2d at 603:

"They must recognize that ' * * * immunity fosters neglect and breeds irresponsibility, while liability promotes care and caution * * *;' [Rabon v. Rowan Memorial Hospital, 269 N.C. 1, 152 S.E.2d 485 at 493]; that the public has an interest also in the protection of life and limb of the individual as a member of society and must require that those who minister to these needs do so carefully; that to lift the mantle of immunity will tend to promote care and caution."

See also Smith, Municipal Tort Liability, 48 Mich.L.Rev. 41, 50 (1949).

The state through its courts applies the doctrine of respondeat superior as between employer and employee, regardless of whether the employer is a business corporation, a not-for-profit corporation, a religious or charitable organization or an individual. We said in Abernathy, 446 S.W.2d at 603, in speaking of the injustice of denying compensation to one injured by the negligence of another or his or its agents or employees, " * * * all persons, organizations and corporations stand equal before the law and must be bound or excused alike." The same should apply to claims against the government based on negligence of its officers and employees. Necessarily, a governmental entity, like any corporate organization, can act only through its officers and employees. The doctrine announced in Brown says that government is to have the benefit of the actions of those agents but no responsibility of them. Such a doctrine is neither logical nor acceptable. I would reject this asserted justification of the rule.

9. See, e. g., Hargrove v. Town of Cocoa Beach, 96 So.2d 130, 132 (Fla. banc 1957); Spencer v. General Hospital, 138 U.S.App. D.C. 48, 425 F.2d 479, 487 (1969) (Wright, J., concurring); Borchard, Government Liability in Tort, 34 Yale L.J. 1, 2 (1924); Green, Freedom of Litigation, 38 Ill.L.Rev. 355, 356 (1944); Freedman, Liability in Tort of Municipal Corporations in Missouri, 3 Mo.L.Rev. 275 (1938); Leflar & Kantrowitz, Tort Liability of the States, 29 N.Y.U.L.Rev. 1363 (1954).

Still another basis for the sovereign tort immunity doctrine was advanced in Cochran v. Wilson, 287 Mo. 210, 229 S.W. 1050, 1054 (1921), as follows:

"Another equally cogent reason why the board of education cannot be required to respond to an action of the character of that at bar is the nature of the fund intrusted to its care and distribution. School funds are collected from the public to be held in trust by boards of education for a specific purpose. That purpose is education. An attempt, therefore, to otherwise apply or expend these funds is without legislative sanction and finds no favor with the courts. Cases in which hospitals have been held exempt from actions for damages for negligence on account of their character as charitable institutions may not inappropriately be cited in this connection."

This theory as a basis for denial of a right of action was exploded in Abernathy, the case in which this court abolished the doctrine of charitable immunity in Missouri. In disposing of that issue, the court said, 446 S.W.2d at 604:

"The 'trust fund' theory as support for the doctrine of immunity rests on an illogical, and therefore weak, foundation. The essence of the theory is that the institutions' funds, given and held for charitable purposes, cannot be used to *pay* judgments resulting from tort claims. Thus, the rationale of the theory is identified solely with the right to *satisfaction* of a judgment, rather than to the fundamental question of whether an injured person has a right to maintain an action and secure a judgment. If it is reasonable to say, and it is, that the existence of liability insurance does not create liability where none exists, then it is also reasonable to say that the inability to have satisfaction of a judgment does not create or support exemption from liability where exemption does not otherwise exist."

Finally, in Payne v. County of Jackson, 484 S.W.2d 483, 486 (Mo.1972), it was suggested that the doctrine of sovereign tort immunity should be continued because its termination could threaten the financial stability of government, the court saying:

"Conversely, wholesale abrogation of the sovereign immunity doctrine could very well deplete the governmental treasury to a point where proper performance of governmental duties would be impaired. Without certain limitations and exceptions, creation of special funds or liability insurance, an economic threat would remain, aside from the number of claims which could arise without any guidelines or procedure or limitations of liability."

A similar argument was advanced by proponents of governmental immunity in Pennsylvania in the case of Ayala v. Philadelphia Board of Public Education, 453 P. 584, 305 A.2d 877 (1973). In rejecting that contention, the court said, l.c. 883:

" * * * It is argued that funds would be diverted to the payment of claims and the performance of proper governmental functions would be obstructed. Initially, we note our disagreement with the assumption that the payment of claims is not a proper governmental function. 'As many writers have pointed out, the fallacy in [the no-fund theory] is that it assumes the very point which is sought to be proved i. e., that payment of damage claims is not a proper purpose.' Molitor v. Kaneland Community Unit District No. 302, supra, 18 Ill.2d at 22, 163 N.E.2d at 94.

"Additionally, the empirical data does not support the fear that governmental functions would be curtailed as a result of liability for tortious conduct. One commentator has written:

'Figures actually compiled showing the claims experience in typical cities show that the spectre of the crippling

judgment, as a deterrent to abrogation of procedural or substantive immunities, so far as [sic] not materialized in any great degree. The force of the "crippling judgment" may be vitiated by self-insurance or commercial insurance . . . So far as known, municipal insolvency proceedings in the federal courts have not occurred because of tort judgments.'

David, supra [6 U.C.L.A.L.Rev.] at 53." See generally Lambert, Tort Law, 35 ATLA L.J. 33, 40 (1974).

I do not agree that abrogation of the doctrine of sovereign tort immunity is likely to deplete governmental treasuries or impair proper performance of governmental functions, particularly in view of the prospective application which I would make of a decision overruling earlier cases on the subject. In addition, experience in this state with reference to tort suits against municipalities in the so-called proprietary fields have not been a serious problem nor a threat to financial stability. It also may be relevant to consider somewhat similar expressions of fear which preceded abolition of the doctrine of charitable immunity. In that connection the court in Abernathy, 446 S.W.2d at 603, said:

"* * * In the states where immunity has not been accorded charity, experience has shown that the apprehension expressed here and elsewhere that the purses of donors would be closed and the funds of charity depleted if these institutions were not granted immunity was not well founded. In the quarter century since the doctrine began its decline, there has been no indication in the states which have abolished immunity that its withdrawal has discouraged donations or

that the funds of these institutions have been depleted resulting in their demise."

That decision was handed down in 1969. More than 5 years have passed and there have been no suggestions that charitable or religious organizations have been threatened or their functions impaired.

The fact is that for quite some time Missouri courts have chipped and whittled away at the doctrine of governmental tort immunity as it applies to municipalities. In the case of functions classified as "proprietary" as contrasted with "governmental," our judicial decisions have held that the city is not protected by the doctrine of sovereign tort immunity. As a result, as is pointed out in Freedman, Liability in Tort of Municipal Corporations in Missouri, 3 Mo.L.Rev. 275, 278 (1938), "Liability or non-liability, therefore, of a municipal corporation for its torts depends not upon the nature of the tort or the relation existing between the city or the injured person, but upon the character of the act performed."

The need for a re-examination of the validity of the doctrine of sovereign tort immunity is underscored by the maze of inconsistency which has developed in these suits against cities.[10] The determinations of what is governmental and what is proprietary have led to uneven and unequal results which defy understanding. A few examples will illustrate.

A city can be required to respond in damages for one injured by negligent conduct of its employee in maintaining sidewalks because our decisions classify such maintenance as a proprietary rather than a governmental function. Taylor v. Kansas City, 342 Mo. 109, 112 S.W.2d 562 (1937). However, if a pedestrian is standing on one of those sidewalks and is struck by a negligently installed or maintained traffic sign

---

10. For general criticisms of the governmental-proprietary distinction see Evans v. Board of County Commissioners, 174 Colo. 97, 482 P.2d 968, 969 (banc 1971); Haney v. City of Lexington, 386 S.W.2d 738, 740 (Ky.1964); Molitor v. Kaneland Community Unit District No. 302, 18 Ill.2d 11, 163 N.E.2d 89, 92 (1959); Spencer v. General Hospital, 138 U.S.App.D.C. 48, 425 F.2d 479, 485–86 (1969) (Wright, J., concurring); K. Davis, Administrative Law Treatise § 25.07 (1958); 2 Harper & James, The Law of Torts § 29.6 (1956); W. Prosser, Torts § 131 (4th ed. 1971).

which falls from the light standard to which it was affixed, the pedestrian may not recover because the sign is for the purpose of controlling traffic on those same streets and that is a governmental function. Gillen v. City of St. Louis, 345 S. W.2d 69 (Mo.1961).

If a motorist is injured by reason of negligent maintenance of a city street, he may sue the city for his injuries. Taylor v. Kansas City, *supra*; Boyd v. Kansas City, 291 Mo. 622, 237 S.W. 1001 (banc 1922). The decisions have classified municipal street maintenance as proprietary. However, if the motorist travels the city streets without injury and then reaches and proceeds upon a state or county road and is injured by reason of defective construction or maintenance (identical to that for which he could have recovered from the city), he cannot maintain his action because we have held that both the state and the county are completely immune under the doctrine of sovereign tort immunity. What was proprietary when the city did it isn't so treated when performed by the county or state.

"[W]here a city owns and operates a water system for the dual purpose of supplying its inhabitants with water for revenue, a proprietary purpose, and also for the prevention of fires and for keeping the city sanitary and healthful, a governmental purpose, then it is the duty of the city to keep the same as a whole in repair and free from danger to others, and, if damage is done by defects in or lack of repair of the water mains or other appliances used concurrently in both capacities, then the city is liable." Lober v. Kansas City, 74 S.W.2d 815, 822 (Mo.1934); see also Koch Bros. Bag Co. v. Kansas City, 315 S.W.2d 743 (Mo.1958). Under the foregoing decisions the city may be held liable for damage to the basement of an inhabitant's building resulting from a leaking main or hydrant and if a city employee should open a hydrant to bleed the lines, remove discoloration or reduce pressure and negligently allows water to damage

someone's property, the city would be liable. On the other hand, if a city employee opens a hydrant for the purpose of cleaning the city street (the maintenance of which is proprietary) and in the process of attempting to shut off the water, exerts sufficient pressure to break the stem, thereby causing water to damage a printing shop and merchandise therein, the city is not liable because cleaning of the streets is classified by the court as a governmental function. Lober v. Kansas City, *supra*.

The operation of public parks by cities has been classified by the courts as proprietary rather than governmental. Bagby v. Kansas City, 338 Mo. 771, 92 S.W.2d 142 (1936). On that theory the court held that installation and maintenance of a rest room and ladies toilet in a park was a proprietary function and the city could be liable in connection therewith. Kuenzel v. City of St. Louis, 278 Mo. 277, 212 S.W. 876 (1919). Strangely, maintenance of a toilet apparently did not have as much relationship to public health as did the washing down of city streets.

In Rennie v. Belleview School District, 521 S.W.2d 423 (Mo. banc 1975), a companion case decided concurrently, recovery is sought from a school district for death of a nine year old boy while playing on a swing set which an employee of the school district had moved from its old location where it had been anchored in concrete and then just left sitting in a new location without again being anchored in the ground. If, in Rennie, defendant had been a school operated by a church or a not-for-profit corporation and plaintiffs' son had been crushed by a playground swing negligently left standing without being anchored as it had been before it was moved, the school district would be subject to suit. This would be true even if every person in the district served by the school belonged to the church or helped organize the not-for-profit corporation to operate the school. Yet, under the principal opinion, these plaintiffs may not maintain their action against the governmentally established

school district. The school district is immune from tort liability as the sovereign.

A similar situation can be hypothesized as to persons injured in hospitals operated side by side, one by the city or county and the other by a not-for-profit corporation organized and supported by every inhabitant of that same city or county. The person negligently injured in the not-for-profit hospital may recover but the inhabitant injured in the city or county hospital may not sue and must bear the loss.

In addition to demonstrating the uneven and inconsistent treatment accorded people by the governmental-proprietary dichotomy, the foregoing cases also illustrate, in my judgment, the fallacy of many of the arguments advanced to sustain the continuance of the entire sovereign tort immunity doctrine. For example, the principal argument relied on in the principal opinion is that the doctrine was created by statute and the courts have no right to change or abrogate it. If that premise is correct, then the courts had no right to modify the doctrine by creating a governmental versus proprietary distinction and then subjecting cities to suits where the court decided to classify a function as proprietary. Yet there are dozens of reported cases in which cities have been held amenable to suits for tort based on asserted negligence of city employees. The recognition by the courts that they could eliminate sovereign tort immunity in such cases as maintenance of streets, sidewalks, parks, waterworks and airports necessarily implies a conclusion that the courts do have the power to modify the doctrine. If there is the power to abrogate in part, there is a right to abrogate completely.

Likewise, the suits allowing recovery against cities for negligence in the performance of functions classified as proprietary also show that the premise in Brown v. City of Craig, *supra,* that a city cannot be held liable under the doctrine of respondeat superior is unsound. If the rule stated in Brown is correct, then the city could not be liable in tort for negligence of an employee in any case, regardless of the character of the act being performed by the employee. It would make no difference, for example, whether the employee was repairing the street or washing it off. It would make no difference whether the employee opened the fireplug to flush out the water line or to obtain water to flush the street. Obviously, I submit, the recognition of municipal liability in proprietary cases constitutes a recognition that a sovereign (in these cases, a city) is not immune from liability under the doctrine of respondeat superior.

The principal opinion sets out various statutes relating to liability insurance to cover municipal liability for tort claims in connection with governmental functions, liability insurance to cover operation of certain state-owned automobiles and an extension of workmen's compensation coverage to state employees. Some of these statutes contain disclaimer provisions which state that they shall not be construed as a waiver of sovereign immunity and the statute with reference to municipalities states that cities shall be liable for torts arising out of governmental functions to the extent of the liability insurance which it carries. The principal opinion concludes from these statutes that they constitute legislative expressions that the general concept of sovereign tort immunity should be retained in Missouri. I do not agree. In my opinion, the legislature simply recognized that the doctrine produces hardships and inequities and the desirability of providing some relief therefrom. The disclaimers are nothing more than that. The acts were not passed for the purpose of abolishing the doctrine and the bills were drafted simply to avoid implications that a complete abrogation by legislative action was intended. None of the acts purport to establish the doctrine of sovereign tort immunity.

A similar contention was made with reference to more comprehensive legislation in California. It was answered by Justice

Traynor in Muskopf v. Corning Hospital District, 55 Cal.2d 211, 11 Cal.Rptr. 89, 93, 359 P.2d 457, 461 (1961), as follows:

"We are not here faced with a situation in which the Legislature has adopted an established judicial interpretation by repeated re-enactment of a statute. * * * Nor are we faced with a comprehensive legislative enactment designed to cover a field. What is before us is a series of sporadic statutes, each operating on a separate area of governmental immunity where its evil was felt most. Defendant would have us say that because the Legislature has removed governmental immunity in these areas we are powerless to remove it in others. We read the statutes as meaning only what they say: that in the areas indicated there shall be no governmental immunity. They leave to the court whether it should adhere to its own rule of immunity in other areas."

See also Carroll v. Kittle, 203 Kan. 841, 457 P.2d 21, 27 (1969); Brown v. City of Omaha, 183 Neb. 430, 160 N.W.2d 805, 807–08 (1968).

The principal opinion makes the statement that to abolish the doctrine in Missouri, as has been done in various other states, would conflict with the public policy of Missouri as articulated in our Constitution. I assume this statement is predicated on the idea that the doctrine was legislatively established and that the court would violate the constitutional separation of powers if it undertook to abolish a legislatively established rule. However, if, as I believe, the doctrine was not enacted as statutory law by the adoption of § 1.010, there is no violation of the separation of powers doctrine by the court if it abolishes

a judicially established doctrine. I know of no other constitutional provision which is involved.

As appellant points out, many states have now abolished or seriously limited the doctrine of sovereign tort immunity. However, I do not believe we should reach a conclusion by counting noses. If we abolish or curtail the doctrine, it should be on the basis that this is the correct thing to do. It is for this reason that I have tried to analyze all justifications advanced to sustain the doctrine. It is significant, however, that a majority of the states have acted to abolish or at least restrict the doctrine. Most have done so by judicial decisions. Other states have made the change by legislative action.[11]

Many of our cases, including the recent cases of Smith v. Consolidated School District No. 2, 408 S.W.2d 50 (Mo. banc 1966), and Payne v. County of Jackson, 484 S.W. 2d 483 (Mo.1972), have stated that because we consistently adhered to the doctrine for a long time, we should retain it, leaving any change therein to legislative action. In effect, this says that where what we do has antiquity we will continue to do it because we have always done it that way. We did not accept that argument in Abernathy v. Sisters of St. Mary's, *supra,* and Garnier v. St. Andrew Presbyterian Church of St. Louis, *supra,* when we were considering whether to continue the doctrine of charitable immunity, and I cannot accept it in this instance. The doctrine of stare decisis serves a very useful and desirable purpose in our jurisprudence by establishing needed stability and predictability in the law. However, the doctrine is not intended to provide rigidity in the law and must not be permitted to do so in cases where an existing rule or doctrine results

---

11. Those who are interested can get an approximation of the present status of the rule in other states by referring to the Restatement of Torts (Second) § 895A (Tent.Draft 1973). See also Ayala v. Philadelphia Board of Public Education, 453 Pa. 584, 305 A.2d 877, 889 (1973). In this connection, it is of interest to note that the Men of Devon case

was later overruled by the English courts and that in 1890 it was established in England that a school board or school district is subject to tort actions for personal injuries on the same basis as a private individual or corporation. Molitor v. Kaneland Community Unit Dist. No. 302, 18 Ill.2d 11, 163 N.E.2d 89, 91 (1959).

in unfair and outmoded discriminatory treatment of persons. In view of my conclusion that whatever reasons previously existed for application of the doctrine no longer justify its continuance, I am reminded of the oft-quoted statement of Mr. Justice Holmes in The Path of the Law, 10 Harv.L.Rev. 457, 469 (1897), wherein he said: "It is revolting to have no better reason for a rule of law than that so it was laid down in the time of Henry IV. It is still more revolting if the grounds upon which it was laid down have vanished long since, and the rule simply persists from blind imitation of the past."

Having concluded that justification for continuance by the courts of the rule of governmental tort immunity does not exist, I would reverse and remand this case for trial. In so doing, however, I would limit the effect of the decision, as did the Supreme Court of Arkansas in Parish v. Pitts, 244 Ark. 1239, 429 S.W.2d 45, 53 (1968), where the court said:

"We would make plain that this decision imposes liability * * * only for the imperfect, negligent, unskillful execution of a thing ordained to be done. No tort action will lie against them for those acts involving judgment and discretion; which are judicial and legislative or quasi-judicial and quasi-legislative in nature. The exercise of discretion necessarily carries with it the right to be wrong. It is only for ordinary torts committed in the execution of the activities decided upon that a tort action will lie; not for the decision itself." [12]

The question then arising is at what time the change in the rule should be made effective as to claims other than those involved in this case and in the companion case of Rennie v. Belleview School District. Various approaches have been utilized by other states. Some have abolished the doctrine retrospectively, permitting utilization of the change as to all claims not barred by limitation. See Muskopf v. Corning Hospital District, *supra.* Others ·have abolished the rule prospectively, effective on either the date of filing or publication of the opinion. This is what we did in the charitable immunity cases, Abernathy, 446 S.W.2d at 606, and other states have done likewise. See Parish v. Pitts, *supra.* A third approach has been to discard the rule prospectively on a specified date in the future, giving governmental units time to adjust their financial planning and perhaps obtain insurance. In addition, this approach permits time for legislative study to determine whether to establish rules with reference to such things as what kind of notice of claims is required and when it must be served on the governmental unit, special periods of limitation, limits on permissible recovery, whether and in which areas there will be continuing immunity, and authorization, if necessary, for the purchase of liability insurance. This was the approach adopted in Evans v. Board of County Commissioners, 174 Colo. 97, 482 P.2d 968 (banc 1971), and in Spanel v. Mounds View School District No. 621, 264 Minn. 279, 118 N.W.2d 795 (1962). Such a course is strongly recommended in Note, The Role of the Courts in Abolishing Governmental Immunity, 1964 Duke L.J. 888, 899.

I believe the latter course is the most logical one where we are dealing with governmental units which will need time in which to adjust their operations to accom-

12. Several state courts, in decisions abrogating governmental tort immunity, have stated that they would retain immunity of the general character described in Parish v. Pitts. See Lipman v. Brisbane Elementary School Dist., 55 Cal.2d 224, 11 Cal.Rptr. 97, 359 P.2d 465 (1961); Hargrove v. Town of Cocoa Beach, 96 So.2d 130 (Fla. banc 1957); Willis v. Department of Conservation & Economic Dev., 55 N.J. 534, 264 A.2d 34 (1969); Holytz v. City of Milwaukee, 17 Wis.2d 26, 115 N.W. 2d 618 (1962). Comparable exceptions are stated in Restatement (Second) of Torts §§ 895B(3)(a) & (b) and (4); 895C(2)(a) & (b) and (3) (Tent.Draft 1973). See also K. Davis, Administrative Law Treatise §§ 25.02, 25.08, 25.09, 25.10, 25.11, 25.13, 25.15, 25.16 (1958); 2 Harper & James, The Law of Torts § 29.14 (1956); W. Prosser, Torts § 131 (4th ed. 1971).

modate to this change. Their budgets are planned in advance and they often do not possess the flexibility to make immediate changes so as to obtain insurance or provide reserves or other means of taking care of claims. Making the change effective in this manner should avoid the confusion which apparently resulted when California abrogated the doctrine retrospectively. Accordingly, I would abrogate the doctrine prospectively as to all claims arising on or after September 1, 1976, which is just after the effective date for legislation that is adopted by the regular 1976 session of the General Assembly. That will give time for it to consider the subject and then to enact such legislation as it deems appropriate.

However, I would permit recovery by plaintiffs in this case and the Rennie case for two reasons. First, if we merely announce the abrogation of governmental immunity without applying it here, such announcement would be mere dictum. Secondly, to refuse to allow recovery would deprive plaintiffs of any benefit from their successful efforts challenging the rule which we now declare erroneous. It would eliminate any incentive for persons in the future to seek to change bad or outmoded doctrines. The practice of permitting recovery by plaintiffs under such circumstances is customary.[13]

Arguably, a course of action which makes abrogation of the doctrine effective as to this and the Rennie case but postpones its application to others until September 1, 1976, is unfair to other persons who now have similar claims or those who have claims arising between now and September 1, 1976. However, those persons may not now maintain an action under existing decisions, so nothing is taken from them. If a change in the rule is to be made, it should be orderly, avoiding confusion and possible chaos for some units. It is better, in my judgment, to change the rule in this manner than to simply retain what we have. Such a technique of prospective application has been approved by numerous authorities since the decision in Great Northern Ry. v. Sunburst Oil & Ref. Co., 287 U.S. 358, 53 S.Ct. 145, 77 L.Ed. 360 (1932).[14]

One final caveat is necessary. This case deals only with governmental tort immunity of a school district. As I have indicated, I would prospectively overrule the doctrine as to all governmental units in Missouri. However, there are cases in Missouri which do not involve torts wherein it is said that the state may not be sued without its consent. State ex rel. Eagleton v. Hall, 389 S.W.2d 798, 801 (Mo. banc 1965); Kleban v. Morris, 363 Mo. 7, 247 S.W.2d 832, 836 (Mo.1952).[15] Whether that rule is separate and apart from the rule of governmental tort immunity is not involved in this case and therefore is not one I would reach or decide.

13. A leading case in this area is Molitor v. Kaneland Community Unit Dist. No. 302, 18 Ill.2d 11, 163 N.E.2d 89, 97 (1959).

14. Abernathy v. Sisters of St. Mary's, 446 S.W.2d 599, 606 (Mo. banc 1969); Evans v. Board of County Comm'rs, 174 Colo. 97, 482 P.2d 968, 972 (banc 1971); Molitor v. Kaneland Community Unit Dist. No. 302, 18 Ill.2d 11, 163 N.E.2d 89, 97 (1959); Spanel v. Mounds View School Dist. No. 621, 264 Minn. 279, 118 N.W.2d 795, 804 (1962); Note, The Role of the Courts in Abolishing Governmental Immunity, 1964 Duke L.J. 888, 898.

15. Other states have such a rule. For example, Wisconsin has a constitutional provision which requires such consent. Holytz v. City of Milwaukee, 17 Wis.2d 26, 115 N.W.2d 618, 625–26 (1962). Others have such a rule even though they have no state constitutional provision such as that in Wisconsin. Spanel v. Mounds View School Dist. No. 621, 264 Minn. 279, 118 N.W.2d 795, 803 n. 42 (1962). In addition, Restatement (Second) of Torts § 895B(1) (Tent.Draft 1973), recognizes such a rule as to the State (but not other subdivisions).